BRYANT CHASE & others[1] vs. INDEPENDENT PRACTICE
ASSOCIATION, INC.

No. 89-P-49.

Hampden. April 12, 1991. - December 17, 1991.

Present: BROWN, PERRETTA, & LAURENCE, JJ.

*Negligence*, Medical malpractice. *Medical Malpractice*, Vicarious liability.
    *Doctor*, Employment. *Agency*, What constitutes, Independent contrac-
    tor. *Practice, Civil*, Summary judgment.

In a medical malpractice case alleging negligence in providing prenatal
    and obstetrical care to the plaintiff, the defendant physician was not
    shown to be an agent whose activities were under the control of a cer-
    tain corporate independent practice association that had acted as a
    third-party broker, with the result that the association could not be held
    vicariously liable for the actions of the physician [664-667]; nor was
    there shown any basis for liability under a theory of "ostensible" or
    "apparent" agency [667-668].

CIVIL ACTION commenced in the Superior Court Depart-
ment on December 3, 1985.

The case was heard by *Elizabeth A. Porada*, J., on a mo-
tion for summary judgment.

*John J. Green, Jr.*, for the plaintiffs.
*Craig M. Brown* for the defendant.

BROWN, J. Relying on the undisputed documents presented
by the parties, a judge of the Superior Court concluded, as
matter of law, that the defendant, Independent Practice As-
sociation, Inc. (IPA), could not be held vicariously liable for
the actions of the other defendants named in the complaint.[2]

---

[1]Rae Ann Chase, the mother of Bryant Chase, in her individual capacity
and as next friend of Bryant Chase, and Mark Chase.

[2]The other defendants were Dr. Ellen Kaufman, Hampden County Gyn-
ecological and Obstetrics, Inc. (HCGO), and Valley Health Plan. There
was a stipulation of dismissal filed as to Valley Health Plan in 1988. The

The plaintiffs appeal from the granting of summary judgment for IPA.

This is a medical malpractice case alleging negligence in providing prenatal and obstetrical care to the plaintiff Rae Ann Chase. The complaint alleges that Dr. Ellen Kaufman, as an agent of the other defendants, failed to conduct certain tests during Ms. Chase's pregnancy and that as a result her child was born afflicted with cerebral palsy and retardation.

At the time she received the medical care described in the complaint (1982), Ms. Chase was a member of a health maintenance organization (HMO)[3] in western Massachusetts known as Valley Health Plan (VHP). Ms. Chase states in her affidavit that she saw at least three physicians during the course of her prenatal care at both Northampton Health Center and Amherst Medical Associates. Dr. Kaufman was one of those physicians. Ms. Chase states that she did not

---

other defendants are not parties to this appeal. See Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974).

[3]A health maintenance organization (HMO) is an entity that both insures for the cost and provides for the delivery of health care services, through negotiated contractual arrangements with selected hospitals and physicians, to a defined, voluntarily enrolled patient population (with whom the HMO also contracts) in exchange for periodic, prepaid, per capita premiums. HMOs organize their physician relationships in one of three ways: staff, group, and IPA (individual, or independent, practice association). In a *staff* model, the HMO directly employs staff physicians and compensates them through salaries. In a *group* model, the HMO contracts with a group of physicians (typically an incorporated group practice) to devote all or much of its time to providing care to HMO members at the group's offices for a set fee per month per covered individual. In an *IPA* model, the HMO contracts on a capitation basis (see note 5, *infra*) with an "independent practice association," an organized (typically incorporated) association of physicians (which association in turn contracts with each of its independent practitioner members with respect to terms and conditions of participation, including method of payment) to provide care to HMO members in the physicians' offices, but the individual physicians also maintain their own practices outside the HMO. See generally Note, Evolving Theories of Malpractice Liability for HMOs, 20 Loyola U. Chi. L.J. 841, 842-844 (1989); ALI/ABA Comm. on Continuing Professional Educ., Managed Health Care: Does it Offer a Cure for the Nation's Health Care Ills? (1991). See also G. L. c. 179G, § 1.

It appears that the HMO in this case is based on the IPA model, but there are in effect two entities that act as independent practice associations — both the defendant IPA and HCGO.

select any of these physicians and was not made aware that the doctors providing her prenatal care were not employees of VHP.

In 1982, VHP had contracted with the defendant IPA to provide and arrange for medical services to VHP members. The contract between VHP and IPA (the VHP-IPA agreement) provided that IPA would be responsible for providing or arranging for the provision of professional medical services for VHP members. IPA would "have the sole and exclusive right and obligation to select, negotiate with, and arrange for, each and every individual, group and organization who, or whose employees, may become and continue to be an IPA Health Professional."[4]

VHP was to pay IPA on a monthly basis using a capitation rate method.[5] IPA was not allowed to charge any health plan member directly for providing or arranging for health services. The VHP-IPA agreement also provided that VHP would be permitted to review the processes and systems used by IPA to provide services and to review IPA's medical record and financial systems, that IPA would establish a committee to control over and under-utilization of services by members, and that IPA would provide, arrange for, or encourage continuing education of IPA health professionals.

Pursuant to the VHP-IPA agreement, IPA then entered into an agreement with HCGO — Hampden County Gynecological and Obstetrics, Inc. (the IPA-HCGO agreement), whereby HCGO, acting through its duly-licensed employees, would provide professional obstetrical and gynecological services to VHP members. The IPA-HCGO agreement con-

---

[4]An "IPA Health Professional" is defined in the VHP-IPA agreement as: "a Health Professional (1) who is employed by IPA; (2) who has agreed, or upon whose behalf an agreement has been made, with IPA to provide health services pursuant to this Agreement; or (3) to whom referrals may be made by other IPA Health Professionals."

[5]A "capitation rate" involves payment of a lump sum per member, per month, as compensation for providing services, regardless of the actual number of services provided to each member. See the discussion of payment methods as they relate to vicarious liability of an HMO in Oakley & Kelley, HMO Liability For Malpractice of Member Physicians: The Case of IPA Model HMOs, 23 Tort & Ins. L.J. 624, 628 (1988).

tained clauses similar to the VHP-IPA agreement in that HCGO agreed to cooperate in utilization-review processes and to obtain authorization from a primary care physician for certain hospital admissions and patient transfers. IPA was to compensate HCGO on a monthly basis also using a capitation method. The IPA-HCGO agreement also stated explicitly that the relationship of the parties was to be that of "purchaser (IPA) and provider . . . (HCGO) of health care services. Each party is and shall continue to be an independent entity. Neither party is the agent or representative of the other, nor shall either party have any express or implied right or authority to assume or create any obligation on behalf of or in the name of the other."

Dr. Kaufman was hired by HCGO in July, 1982. She was paid an annual salary and received vacation and health benefits through HCGO, and the employment agreement between HCGO and Dr. Kaufman provided that HCGO had the right to terminate her employment. Dr. Kaufman was one of three HCGO obstetricians who provided care to patients in labor at Northampton Health Center. Another physician employed by HCGO arranged Dr. Kaufman's schedule, and Dr. Kaufman was supervised in her medical treatment of patients by other physicians employed by HCGO.

In the present case, the affidavits and contract documents submitted by the parties demonstrate, as matter of law, that IPA did not control, or retain the right to control, the professional activities of Dr. Kaufman and HCGO. From the material presented, the plaintiff would be unable to prove at trial that any negligence on the part of Dr. Kaufman or HCGO was attributable to IPA by virtue of its contractual arrangements with VHP or HCGO.[6]

---

[6]For a recent discussion of principles which guide the allowance or denial of a motion for summary judgment, see *Kourouvacilis* v. *General Motors Corp.*, 410 Mass. 706, 716 (1991) (moving party "is entitled to summary judgment if he demonstrates . . . that the party opposing the motion has no reasonable expectation of proving an essential element of that party's case. To be successful, a moving party need not submit affirmative evidence to negate one or more elements of the other party's claim").

"The right to control an agent's activities has been the guiding principle in deciding cases involving an assertion of vicarious liability against the agent's principal." *Kelley* v. *Rossi*, 395 Mass. 659, 661 (1985). In the employment context, a master-servant relationship is determined by a number of factors, including the right of the employer to control the details of the work done by the employee, the method of payment, the skill required in the particular occupation, whether the employer supplies the tools, instrumentalities and place of work, as well as the parties' own belief as to whether they are creating a master-servant relationship. See Restatement (Second) of Agency § 220 (1957); *Khoury* v. *Edison Elec. Illuminating Co.*, 265 Mass. 236, 238 (1928).

Because of the high level of skill involved in the practice of medicine, physicians have traditionally been viewed as independent contractors, allowing hospitals and other medical centers to remain exempt from liability for negligent acts of a physician. See *Kelley* v. *Rossi*, 395 Mass. at 662 ("the very nature of a physician's function tends to suggest that in most instances he will act as an independent contractor"). See also Note, Evolving Theories of Malpractice Liability for HMOs, 20 Loyola U. Chi. L.J. 841, 847-848 (1989).

While Massachusetts courts have indicated a willingness to hold hospitals and other health providers vicariously liable for a physician's negligence in some circumstances, see *McMurdo* v. *Getter*, 298 Mass. 363, 368 (1937); *Smith* v. *Steinberg*, 395 Mass. 666 (1985), the test of vicarious liability is still one of control or right of control by the employer (i.e., hospital or HMO) over the actual conduct by the physician (employee) alleged to be negligent. See *Harnish* v. *Children's Hosp. Med. Center*, 387 Mass. 152, 159 (1982). See also *Kapp* v. *Ballantine*, 380 Mass. 186, 195 (1980); *Gugino* v. *Harvard Community Health Plan*, 380 Mass. 464, 468 (1980).

Surprisingly little case law exists on the liability of HMOs for the negligence of their participating physicians. That which does exist tends to suggest that the same principles of liability that have been applied to hospitals will apply to

HMOs. See, e.g., *Gugino* v. *Harvard Community Health Plan, supra* (medical malpractice tribunal will apply the same standard of review to an HMO as to other medical providers). See also *Sloan* v. *Metro Health Council*, 516 N.E.2d 1104 (Ind. Ct. App. 1987) (HMO may be held vicariously liable if usual requisites of an employer-employee relationship exist).

The doctrine of respondeat superior will be applicable most often in a so-called staff-model HMO, where the HMO directly employs the physicians and pays them on a salaried, rather than a fee-for-service, basis.[7] In *Gugino* v. *Harvard Community Health Plan, supra*, the court, in discussing the liability of this staff-model HMO, stated: "if the [HMO] is to be held liable, there must be a factual basis for inferring that the [HMO] had power of control or direction over the conduct in question." *Id.* at 468.

Unlike the HMO in *Gugino*, VHP did not employ physicians directly. Instead, it contracted with IPA to arrange for medical services to its members. IPA in turn contracted with HCGO, who in turn employed Dr. Kaufman. IPA does not pay any physician employees and functions in effect as a third-party broker, arranging for services on behalf of VHP members.

That IPA did not retain the right to control the professional activities of Dr. Kaufman and HCGO is clear from the IPA-HCGO agreement. Cf. *Kelley* v. *Rossi*, 395 Mass. at 663 ("There is hardly any question whether the doctor here was a servant"). While IPA did check the credentials of the agencies with whom it contracted, it did not have the right to hire and fire individual physicians, nor to set their salaries, work schedules, or terms of employment. More importantly, IPA did not control the actual medical decisions made by HCGO and Dr. Kaufman. Although the agreement between IPA and HCGO does provide for certain cost-containment and utilization-review measures, it also makes clear

---

[7]See note 3, *supra*.

that responsibility for the actual provision of medical treatment rests with HCGO and its employee-physicians.[8]

IPA is also not liable under a theory of "ostensible" or "apparent" agency. Other courts which have considered this theory in a medical malpractice context have found that an HMO may be liable if the HMO creates an appearance that the physician is its employee, regardless of a physician's actual status. See, e.g., *Hannola* v. *Lakewood*, 68 Ohio App. 2d 61 (1980) (physicians on duty in hospital emergency room were agents of hospital regardless of contractual arrangements referring to them as independent contractors); *Boyd* v. *Albert Einstein Med. Center*, 377 Pa. Super. 609 (1988) (summary judgment reversed where issue of material fact existed as to whether physicians were ostensible agents of HMO); *Williams* v. *Good Health Plus, Inc.*, 743 S.W.2d 373 (Tex. Ct. App. 1987) (evidence in medical record tended to negate plaintiff's argument that HMO held itself out as actual practitioner of medicine; ostensible agency theory not reached because not raised below). See also Restatement (Second) of Agency § 267.

There is no factual basis in this record to support a theory of ostensible agency. Ms. Chase's membership agreement with VHP defines IPA as "a corporation formed to *arrange for* professional health services for members having contracts with [VHP] and other health professionals to provide such services" (emphasis supplied). Standing alone, Ms. Chase's statement in her affidavit that she was not "made aware that the doctors that were providing her prenatal care were not employees of [VHP]" is insufficient to raise a claim of ostensible agency. Moreover, Ms. Chase does not allege that she believed Dr. Kaufman or HCGO were employees or agents

---

[8]See *Wickline* v. *State*, 192 Cal. App. 3d 1630, 1647 (1986), where the court recognized "that cost consciousness has become a permanent feature of the health care system, [and] it is essential that cost limitation programs not be permitted to corrupt medical judgment," before concluding that no such corruption had occurred in the case before it. The plaintiffs in this case have also failed to demonstrate how the alleged negligence of Dr. Kaufman or HCGO was the result of any cost-containment measures flowing from the IPA contract.

of IPA, only that she was not aware they were not employees of VHP. In order to hold IPA liable under an ostensible agency theory, there would have to be a showing of reliance on representations by IPA, that Dr. Kaufman and HCGO were its agents or employees. The plaintiffs do not allege that such representations were made by IPA and they therefore cannot prevail on this claim.

Summary judgment was properly granted in favor of the defendant IPA.[9]

*Judgment affirmed.*

---

[9]The facts of this case, together with the continuing growth of HMOs and the increasing complexity of the health care industry, might suggest another case in which a health insurance entity attempts, by raising multiple layers of corporate and contractual relationships, to escape accountability for the negligence of physicians and other health care providers, to whom they direct their members or subscribers for care. This, however, is not that case.