Kottmyer, J.
INTRODUCTION
Plaintiffs bring this action against defendants Drs. Maura Keene (“Keene”), Diane Amsterdam (“Amsterdam”), Walter Glaser, and Mary E. Annarella (“An-narella") for negligence in failing to diagnose and treat Anne Grenadier-Terault (“Grenadier-Terault”). Plaintiffs also assert claims against SmithKline Beecham Clinical Laboratories (“SmithKline”), Northeast Per-manete Medical Group, P.C., and Carlson Pathology Associates (“Carlson") based on vicarious liability. Defendants SmithKline and Carlson now move for summary judgment. For the following reasons, their motions for summary judgment are DENIED.
BACKGROUND
The facts, viewed in the light most favorable to plaintiffs, are as follows. On November 15, 1993, Amsterdam collected a Pap smear from Grenadier-Terault which he then sent to the SmithKline laboratory in Waltham, Massachusetts (“the Laboratory”) for interpretation. On December 1, 1993, a cytotechnologist employed by SmithKline who had reviewed the slide referred it to Annarella, a pathologist who was also the Medical Director of the Laboratory. Annarella incorrectly read the slide as being within normal limits. Plaintiffs allege Annarella negligently interpreted the slide and that SmithKline and Carlson are vicariously liable for her negligence.
• On September 1, 1993, Annarella and Carlson had executed an employment agreement (the “Employment Agreement”) wherein Carlson agreed to employ Annarella as a Senior Pathologist. The Employment Agreement provided that Annarella would serve as Medical Director of the Laboratory and provide [pathology] services at the Laboratory. The Employment Agreement further provided that Annarella would provide pathology and administrative services to Brockton Hospital. Carlson reserved the right to designate other locations at which Annarella would provide pathology services. The Employment Agreement provided that Annarella would perform all her duties under the supervision and direction of the President of Carlson Pathology, who was also a pathologist. In the Employment Agreement, Annarella agreed that she would not undertake additional professional obligations without consent of the President of Carlson Pathology. Carlson had the right to terminate An-narella for cause relating to patient care or if Carlson ceased to provide services to the Laboratory. The Employment Agreement expressly provided that An-narella would provide services under the agreement in accordance with SmithKline’s qualify assurance standards and its bylaws, rules and regulations, as well as all applicable regulations and laws.
Annarella divided her time between Brockton Hospital and the Laboratory which are not related entities. Annarella believed she was an employee of Carlson. Her superior at Carlson was Dr. Carlson, but she did *57 not consider Dr. Carlson her superior with respect to what she did at SmithKline. Carlson paid Annarella’s salary. Her salary did not depend upon the number of slides she reviewed at SmithKline. Carlson provided Annarella fringe benefits including vacation time, continuing education leave, sick leave, and holidays and procured professional liability insurance covering her. Carlson set charges, billed, and collected fees for services rendered by Annarella at the Laboratory and at Brockton Hospital.
In the Employment Agreement, Annarella agreed to provide services to SmithKline pursuant to any oral and written agreements between Carlson and Smith-Kline. Sometime before December 1993, when An-narella reviewed Grenadier-Terault’s slide, Carlson and SmithKline had orally agreed that Carlson would provide SmithKline pathology services and the services of a Medical Director. Carlson’s designation of a physician to serve as Medical Director and provide pathology services was subject to SmithKline’s approval. SmithKline did approve the selection of An-narella.
On March 1, 1994, Carlson and SmithKline executed a written agreement, which covered the same services (the “SmithKline-Carlson Agreement”). In the SmithKline-Carlson Agreement, Carlson agreed to provide a qualified pathologist to act as Medical Director of the Laboratory and to review slides. The Medical Director maintained quality control measures and assured that the Laboratory complied with all SmithKline’s policies and procedures, as well as all federal, state, and local laws, rules, and regulations. The Medical Director reviewed and inspected all tech-nics and testing performed in the laboratory.
As Medical Director, Annarella had an office at the Laboratory, SmithKline writing tablets with her name printed on them, and SmithKline business cards. Annarella’s name appeared on all Laboratory reports. SmithKline’s laboratory organization chart also listed Annarella as a pathologist. SmithKline required An-narella to follow and enforce policies and procedures contained in its cytopathology handbooks. SmithKline’s policies and procedures required a pathologist to review certain categories of slides. Grenadier-Terault’s slide fell within such a category because a cytotechnologist marked Anne Grenadier-Terault’s Pap smear as having squamous and endocervical cells. Annarella reviewed Grenadier-Terault’s slide in her capacity as pathologist. SmithKline billed and received payment from Grenadier-Terault (or her insurer) for Annarella’s review of Grenadier Terault’s pap smear.
Annarella spent approximately twenty hours per week at SmithKline. She spent the majority of her time interpreting slides. SmithKline provided all necessary laboratory equipment and supplies. Annarella reported her results in accordance with SmithKline’s reporting system. The system employed by Annarella to mark slides was the system used by SmithKline. She used SmithKline’s diagnostic form in reading slides and SmithKline’s standardized codes. Several times each day Annarella consulted with SmithKline’s cytology supervisor or senior technician about findings and, on occasion, consulted with Dr. Carlson about a particular slide.
Pursuant to Chapter 111D, §4 of the Massachusetts General Laws, SmithKline was required to have a clinical laboratory license to operate the Laboratory. On October 1, 1991, the Massachusetts Department of Public Health (the “Department”) granted SmithK-line a full clinical laboratory license effective as of February 28, 1992. Annarella practiced clinical pathology at the Laboratory under SmithKline’s clinical laboratory license.
The Massachusetts licensing scheme requires all clinical laboratories to appoint a clinical laboratory director. The director is responsible for the direction of the technical and scientific operation of the laboratory. G.L.c. 111D, §7.[3] The regulations provide that “the owner and director shall, if different persons, be jointly and severally responsible for the operation of the laboratory in compliance with [regulatory and statutory requirements].” 105 CMR 180.041(E).
The regulations establish minimum standards of quality assurance all licensed clinical laboratories must follow. The laboratory must make its procedure manual readily available, at all times, in the work area of personnel examining specimens. The manuals must contain complete descriptions and instructions for all automated and manual test procedures including the analytical methods to be used, the control and calibration procedures, and the available literature references. Id. 180.255.
The regulations further require the laboratory to establish procedures for conducting screening tests. The procedures must include rules regarding specimen collection and preparation, materials and equipment to use, steps to follow to perform the test, limitations of the procedure, cautions to observe that may affect test results, safety precautions to protect patients and personnel, normal range of results, results which require follow up by a physician, quality control procedures, calibration and maintenance of equipment, as well as remedial and corrective measures necessary if quality control results fall outside acceptable limits. Furthermore, the Department requires the laboratory to review all test methods each day to assure proper diagnosis. Id. The regulations also establish stringent quality control measures and require all licensed clinical laboratories to participate in proficiency testing programs.
In addition to the Department’s regulations, all licensed clinical laboratories must comply with similarly detailed and extensive regulations established by the United States Department of Public Health and Human Services. See 42 CFR §493.000 et seq. The federal regulations also require the laboratory to es *58 tablish written policies and procedures for the collection and examination of specimens, including step-by-step performance of the procedure. 42 CFR §493.211(b).
DISCUSSION
1.SUMMARY JUDGMENT STANDARD
This court grants summary judgment where there are no genuine issues of material fact and where the summary judgment record entitles the moving party to judgment as a matter of law. Mass.R.Civ.R 56(c): Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989) A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue by either submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the nonmoving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
2.DIRECTION OR CONTROL
Whether an individual is an employee or an independent contractor is usually a question of fact. Thorson v. Mandell, 402 Mass. 744, 747 (1988). The primary test is the purported employer’s right to control the individual’s work. Silvia v. Woodhouse, 356 Mass. 119, 124 (1969). Courts generally view physicians as independent contractors, allowing hospitals and other medical centers to remain exempt from liability. Chase v. Independent Practice Ass’n, Inc., 31 Mass.App.Ct. 661, 665 (1991).[4] “While physicians exercise independent judgment, a physician can still be deemed a servant where the principal controls the details of the physician’s activities.” McNamara v. Honeyman, 406 Mass. 43, 48 (1989), citing Kelley v. Rossi, 395 Mass. 659, 662 (1985). The analysis looks to the extent the employer controls the details of the work performed, as well as to broad factors showing the employer’s general control over the physician. Chase v. Independent Practice Assn, Inc., 31 Mass.App.Ct. 661, 665 (1991). These factors include the parties’ own beliefs, the method of payment, the skill required of the particular occupation, whether the employer provides tools, instrumentalities, and place of work, and whether the employee has a choice as to patients treated and hours worked. See Kelley v. Rossi, 395 Mass. 659, 664-65 (1985); Chase v. Independent Practice Ass’n, Inc., 31 Mass.App.Ct. 661, 665 (1991), citing Khoury v. Edison Elec. Illuminating Co., 265 Mass. 236, 238 (1928). The determination of direction or control is usually a question of fact for the jury. Williams v. Hartman, 413 Mass. 398, 400 (1992), citing Rowe v. Arlington, 28 Mass.App.Ct. 389, 391 (1990); Corsetta v. Stone Co., 396 Mass. 1, 11 (1985).[5]
There are genuine issues of fact precluding summary judgment in this case. SmithKline provided the laboratory, supplies and equipment used by Annarella to read slides. She is listed as a pathologist on SmithKline’s organizational chart. In reading slides, she was required to follow SmithKline’s policy and procedures handbooks and the methods of reporting her results set forth therein. The specific slides which Annarella reviewed were selected in accordance with SmithKline policies and procedures. SmithKline set the charges for, billed and collected fees from the patient or his/her insurer for Annarella’s services in interpreting slides.
The summary judgment record also raises material questions of fact as to whether Carlson is vicariously liable for Annarella’s alleged negligence. Annarella had an employment agreement with Carlson and believed she was employed by Carlson. Carlson paid her salary and provided fringe benefits and professional liability insurance. Her salary was not dependent upon the number of slides she reviewed while at SmithKline. Carlson had the right to collect fees for services rendered by Annarella. The Employment Agreement required Annarella to perform her duties under the supervision and direction of the President of Carlson Pathology.
Genuine issues of material fact therefore exist as to whether Annarella was under the direction or control of SmithKline, Carlson, or both at the time of the alleged negligence. See Restatement (Second) of Agency §226 (person may be servant of two masters at one time as to the same act).
3.RESTATEMENT (SECOND) OF TORTS §428
Plaintiffs argue that if Annarella were an independent contractor, summary judgment would be precluded because SmithKline is liable for her alleged negligence in reading the slide pursuant to section 428 of the Restatement (Second) of Torts. Section 428 provides:
An individual or a corporation carrying on an activity which can be lawfully carried on only under a franchise granted by public authority and which involves an unreasonable risk of harm to others, is subject to liability for physical harm caused to such others by the negligence of a contractor employed to do work in carrying on the activity.
Restatement (Second) of Torts §428. The Supreme Judicial Court in Barry v. Keeler, 322 Mass. 114 (1947), applied section 428 and held that the owner of a vehicle transporting freight under a franchise granted by the Interstate Commerce Commission and the Department of Public Utilities was vicariously liable for the actions of his contracted driver.[6]
The theory of nondelegable duty is an exception to the common law rule set forth in §409 of the restatement that an employer is not liable for the negligence of independent contractors. W. Keeton, D. Dobbs, R. *59 Keeton, D. Owen, Prosser and Keeton on the Law of Torts, §71 at 511-12 (5th ed. 1984). The exception typically involves cases in which the nature of the work performed by the independent contractor is inherently dangerous or requires specific precautions to avoid creating a danger. See §428 and comment a. See also Barry v. Keeler, supra, 322 Mass. at 127, where the Court, quoting Venuto v. Robinson, 118 F.2d 679 (3d Cir. 1941), noted that “the carriage of freight in high powered motor vehicles on public highways is certainly business attended with very considerable risk.”
In the Reporter’s Notes which precedes §§416-429 of the Restatement, however, the commentators note that there has been a marked tendency to expand the exceptions to the common law rule of nonliability set forth in §409. They conclude: “[T]he law is undergoing a process of development, toward limits which are still uncertain.” Restatement (Second) of Torts at 394-95 (1964).
Comment (b) to §409 states that the exceptions to the common law rule “have so far eroded the ‘general rule’ that it can now be said to be ‘general’ only in the sense that it is applied where no good reason is found for departing from it.” Id. at 370-71.[7] The reporters then group the exceptions in three broad categories: 1) negligence in selecting, instructing or supervising the contractor, i.e., cases involving negligence by the employer; 2) nondelegable duties of the employer arising out of some relation toward the public or the particular plaintiff; and 3) work which is specially, peculiarly or “inherently” dangerous. Id. The commentators thus suggest that notwithstanding the language of §428 and, in particular, comment (a) thereto which suggest such a limitation, the nondelegable duly exception to the common law rule is not limited to cases which involve the performance of work which is inherently dangerous or requires special precautions. Examples of cases in which a nondelegable duty has been imposed in the absence of an inherently dangerous activity or one requiring special precautions are found in Prosser, supra, §71 at 511-12.
As discussed above, the operation of clinical laboratories in Massachusetts is extensively regulated. The Department may revoke or suspend a laboratory's license to operate if the laboratory fails to meet any requirement of law or if the Department deems it necessary for the protection of the health or safety of the public. 105 CMR §180.035(C) & (D) (1994) The owner of the laboratory (the licensee) is responsible for compliance with all laws and regulations, as well as for the assurance of public safety. Licensees may not “transfer to the license ... , or assign any authority granted thereunder . . . without first obtaining the department’s written permission . . .” G.L.c. 111D, §5 (emphasis added).
Whether a commercial clinical laboratory can delegate its duties under its license to physicians working at the facility as independent contractors and shield itself from liability for negligence in performing the very function which gave rise to the licensing requirements is a question of first impression in Massachusetts. Indeed, the Court has found no case directly on point. Cases most closely analogous involve the liability of hospitals for negligence of physicians who staff emergency rooms and radiology departments pursuant to contracts between the institution and an independent contractor.[8] Those cases are of limited utility in the present context, however, because the policy implications of imposing vicarious liability on hospitals in connection with their operation of emergency rooms and radiology departments are different from those implicated by imposing vicarious liability on a commercial laboratory.[9] Compare Estates of Milliron v. Franke, 793 P.2d 824, 826-27 (Mont. 1990) (providing consulting radiologists with offices at hospital helps ensure that small rural communities will be provided with adequate medical care).
The work of reviewing slides and reporting results is not inherently dangerous. But Chapter 11 ID and regulations established pursuant to §2 thereof are obviously predicated on a legislative assessment that the services provided by clinical laboratories involve a threat of harm to the public so substantial as to require that businesses offering such services be subject to strict controls over virtually every aspect of the work. Further, the alleged negligence in this case grows out of the principal activity giving rise to the risk, the examination of specimens.
The criterion for recognizing a nondelegable duty rests on a determination that the responsibility in question is so important to the community that the employer should not be permitted to transfer it to another. Prosser, supra, §71 at 512. Given the requirement of a license, the extensive regulatory scheme governing all aspects of the operation of a licensed laboratory and the fact that the statutory and regulatory scheme places responsibility for the operation of the laboratory on the licensee, the Court is not prepared to hold that Massachusetts will not impose vicarious liability predicated on a nondelegable duty in the circumstances of this case. That determination, if necessary,[10] should be made on the basis of a fully developed record. SmithKline’s motion for summary judgment is therefore denied on this ground as well.
ORDER
For the reasons stated above, it is hereby ORDERED that defendants SmithKline Beecham Clinical Laboratories and Carlson Pathology Associates’ motions for summary judgment are DENIED.

 The regulations promulgated by the Department set forth qualifications required of the laboratory director and his or her duties and responsibilities. 105 CMR 180.070. The director must spend an adequate amount of time at the laboratory to direct and supervise the technical performance of the staff and be available for personal and telephone consultation. The regulations provide that the director is responsible for ensuring the quality operation and the accuracy of test results, as well as for the employment of qualified laboratory personnel and their in-service training.

 See Memorandum of Decision and Order on Defendant Shield's Healthcare Group, Inc.’s Motion for Summary judgment, Miller v. Kurklian, Norfolk Superior Court Civil Action No. 95-1723B, 6 Mass. L. Rptr. 591 (Gants, J.) for a review of the development of the standard for vicarious liability in cases involving alleged negligence of physicians. As pointed out by Judge Gants, many of the cases cited on this issue concern the question whether a physician is a “public employee.” See Kelley v. Rossi, 395 Mass. 659, 661 (1985) (the legal principles which govern the determination whether a doctor is a public employee are the same as those that have determined whether an agent is a servant).

 But see Estate of Harold Skillman v. Riskalla, 2 Mass. L. Rptr. No. 5, 90, 92 (June 6, 1994), where the Court declared, as a matter of law, that a physician was an employee of a hospital to which he provided anesthesiology services. The hospital contracted with MGH Professional Services Corporation (“MGH") to provide the hospital with anesthesiology services. MGH hired the physician to provide these services to the hospital. The court noted that the hospital set the physician’s hours of work, chose the physician’s patients, provided the physician facilities, and required the physician to adhere to its by-laws. MGH, on the other hand, paid the physician’s salary which did not depend on productivity, provided the physician insurance and collected his bills.

 In Barry the Court questioned the appropriateness of the word “unreasonable” in Section 428, but accepted the principle of that section. Massachusetts courts have applied the rule adopted in Barry infrequently. The Superior Court has held that a general contractor could be liable for a subcontractor’s negligent repair of a kitchen floor under section 428. Harkins v. Colonial Floors, Inc., 8 Mass. L. Rptr. No. 6, 127, 131-32 (April 13, 1998). The repairs involved the removal of asbestos, an inherently dangerous activity which one must be licensed to perform. The Massachusetts Appellate Division applied section 428 to hold the owner of a taxicab license liable for the actions of the driver who leased the license. Teixeira v. Cab Three, Inc., 1994 Mass.App.Div. 154, 157.

 “[B]ecause there are so many exceptions to this general rule (section 409], the rule itself has been described as a ‘preamble to the catalog of its exceptions.’ ” Santella v. Whynott, 37 Mass.App.Ct. 451, 453 (1989), quoting comment b.

 In Jackson v. Power, 743 2.2d 1376 (1987), the court held that a general acute care hospital has a nondelegable duly to provide physicians for emergency room care. Jackson v. Power, 743 P.2d 1376, 1385 (1987). See also Martell v. St. Charles Hosp., 523 N.Y.S.2d 342, 352 (Sup. 1987) (suggesting New York should hold hospitals liable for the malpractice of independent emergency room physicians); Simmons v. Tuomey Reg'l Med. Ctr., 498 S.E.2d 408, 413 (S.C. App. 1998) (holding hospital possesses nondelegable duty to provide patients emergency room care). But see Kelly v. St. Luke’s Hosp., 826 S.W.2d 391, 395 (Mo. App. W.D. 1992) (stating hospitals do not have nondelegable duty to provide emergency room care); Estate of Milliron v. Franke, 793 P.2d 824, 827 (Mont. 1990) (stating Jackson stands alone as only case to apply nondelegable duty to hold hospital liable for independent physician’s negligence); Baptist Mem'l Hosp. Sys. v. Sampson, 969 S.W.2d 945, 949 (Tex. 1998) (stating hospitals may delegate duty to provide emergency room care); Pamperin v. Trinity Mem'l Hosp., 423 N.W.2d 848, 858 (Wis. 1988) (hospital may delegate duly to have radiologist available to independent contractor).

 The Massachusetts Appeals Court held that a hospital is entitled to summary judgment when facts show the negligent physician was part of an incorporated physicians group providing hospital emergency room care as an independent contractor. The issue whether the hospital had a nondelega-ble duty was not discussed. Reide v. Cape Cod Hosp., 36 Mass.App.Ct. 553, 554-55 (1994).

 A jury finding of vicarious liability on the part of Smith-Kline based on direction and control may moot this issue.