Gants, J.
More than three years after filing her complaint, the plaintiff, Carole Daniels, in her capacity as the Executrix of the Estate of her late husband, Bruce Daniels, has moved to amend her medical malpractice complaint to add Dr. Gretchen Lipke as a defendant. Dr. Lipke opposed the motion to amend on two grounds. First, she claimed prejudice from the delay in naming her as a defendant. Second, she contended that adding her as a defendant would ultimately prove futile, because she was acting as a public employee at the time of her alleged negligence, so any claim against her would be barred under the Massachusetts Tort Claims Act (“the Act”), G.L.c. 258, §§1 etseq.
This Court rejected Dr. Lipke’s claim of prejudice, but asked for additional briefing on the issue of futility. The Court recognized that, when a defendant contends that an amendment to a complaint would be futile, the question for the court generally is whether the newly added count would be dismissed on a motion to dismiss. See, e.g., Jessie v. Boynton, 372 Mass. 293, 295 (1977). If that were the only question asked here, this Court acknowledges that the motion to amend would be allowed because of the generous standard afforded complaints on a motion to dismiss. See Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 89 (1979) (a motion to dismiss must be denied when the facts alleged, generously construed in favor of the plaintiff, state a valid legal claim that would warrant relief on any theory of law). This Court, however, largely because of the age of this case, determined that it was more appropriate here to measure futility on a summary judgment standard, and give the parties the opportunity to conduct the discovery they needed on this issue. In short, it did not make sense to add Dr. Lipke as a defendant, wait for a new medical malpractice tribunal to be arranged, and conduct additional discovery regarding her alleged malpractice if, on summary judgment, she would be found to have treated Mr. Daniels as a public employee and be dismissed from the case. The wiser course was essentially to treat the plaintiffs motion to amend as Dr. Lipke’s expedited motion for summary judgment. If Dr. Lipke were indeed shielded from personal liability under the Act, the motion to amend would be denied.[1] If Dr. Lipke were not shielded from personal liability under the Act or if there were issues of fact as to whether she was shielded from liability, then the motion to amend would be allowed.
After hearing, for the reasons detailed below, the plaintiffs motion to amend to add Dr. Lipke as a defendant is DENIED.
BACKGROUND
As stated earlier, this Court shall evaluate this motion to amend as it would a motion for summary judgment, which means that it must rely on facts not in dispute as well as disputed facts viewed in the light most favorable to the plaintiff. Beal v. Board of Selectmen of Hingham, 419 Mass. 535, 539 (1995). Consequently, the facts stated below are presented in the light most favorable to Ms. Daniels and should not be misunderstood as findings of the Court.
In May 1996, Dr. Lipke was employed by the Commonwealth of Massachusetts as a second year resident in emergency medicine at the University of Massachusetts Medical Center in Worcester (“UMMC”). UMMC, among its emergency medical duties, operated a helicopter transportation service known as U. Mass Life Flight (“Life Flight”), that provided expedited transportation under constant physician monitoring to patients in need. All second and third year emergency medicine residents at UMMC were assigned periodically to staff the Life Flight on twelve hour shifts. When assigned to the Life Flight, these residents, including Dr. Lipke, remained subject to the supervision, direction, and control of the UMMC Residency Program and the UMMC emergency medicine physicians, and continued to be Commonwealth employees.
On May 23, 1996, Mr. Daniels was playing tennis when he suddenly developed chest pain, sat down, and passed out. When the emergency medical technicians arrived, his systolic blood pressure had fallen to 40, and he had no palpable pulse. He was taken to the Leonard Morse campus of Metrowest Medical Center (“Metrowest”), where his electrocardiogram revealed a myocardial infarction. After treatment in the Metrowest emergency room, his systolic blood pressure rose to 110 and the decision was made to transport him to Massachusetts General Hospital (“Mass. General”), so Life Flight was called.
Dr. Lipke was the emergency physician on the Life Flight that arrived at Metrowest that evening to transport Mr. Daniels to Mass. General. Under the policy and practice at Metrowest in effect at that time, a patient remained the responsibility of the attending physician at Metrowest until a report was given regarding the patient’s condition to the Life Flight physician. When the report was completed, responsibility for the patient was transferred to the Life Flight physician. However, if the patient’s condition were to change dramatically for the worse after the report had been given and the patient became unstable, the attending physician at Metrowest would again become involved because of his special expertise and greater knowledge of the condition of the patient. At that point, the relationship between the Metrowest attending physician and the Life Flight emergency physician would become collaborative, with the emergency physician doing whatever she could to assist the attending physician in providing treatment to the unstable patient.
Here, Dr. Lipke arrived at Metrowest and received a report regarding Mr. Daniels’ condition. While still *381 in the emergency room, she observed that Mr. Daniels was working harder to breathe. She decided that he was at severe respiratory risk and made the decision to intubate him before transporting him to Mass. General. She attempted to insert the tube into Mr. Daniels’ airway, but was not successful. Four more attempts were made by others to intubate him until the fifth, made by a respiratory therapist, was successful. Towards the end of the prolonged intubation process, Mr. Daniels’ oxygen level in the blood became low, a condition known as hypoxia. Shortly after the intubation was completed, Mr. Daniels suffered a cardiac arrest, and the defendants, Dr. Vikas Desai and Dr. Ronald Dunlop, responded to the “Code Blue” alert. Dr. Desai, the cardiologist who had been Mr. Daniels’ attending physician prior to the report, served as Team Leader of the Code Team, and Dr. Lipke, along with Dr. Dunlop, was a member of that Team. The Code Team eventually succeeded in stabilizing Mr. Daniels and he was later transported by Life Flight to Mass. General, where he died four days later.
The plaintiff alleges that Dr. Lipke was negligent in deciding to intubate Mr. Daniels and in the procedure she used to intubate him during the five attempts, which the plaintiffs contends led to Mr. Daniels’ cardiac arrest and subsequent death. The issue before this Court is not whether Dr. Lipke was negligent, but whether, at the time of the alleged negligence, she was acting under the direction and control of her public employer, UMMC, and therefore is shielded from personal liability under the Act.
DISCUSSION
Under the Act, the term “public employee” is not defined, but “public employer” is defined as a public entity “which exercises direction and control over the public employee.” G.L.c. 258, §1. The plaintiff acknowledges that Dr. Lipke was under the direction and control of her employer, UMMC, when she left on that Life Flight helicopter on May 23, 1996 to transport Mr. Daniels to Mass. General, but contends that she came under the direction and control of Dr. Desai when he arrived following the “Code Blue” and took control of the Code Team that attempted to save Mr. Daniels’ life after his cardiac arrest. Dr. Lipke, while conceding that there is evidence from the Metrowest medical records that support the inference that she was a member of the Code Team led by Dr. Desai after Mr. Daniels’ cardiac arrest, contends that she always remained under the direction and control of the UMMC with respect to everything she did as part of her Life Flight emergency medical duties. In short, to determine who exercised direction and control over Dr. Lipke, the plaintiff asks this Court to look at who could direct and control her conduct with respect to her care of Mr. Daniels after his cardiac arrest, while Dr. Lipke asks this Court to look at who was responsible for directing and controlling her overall conduct as an emergency medicine resident.
In considering whose definition is legally correct, it is important to remember that this issue arises in medical malpractice law in two quite separate contexts. First, as here, it arises in determining whether a physician who practices in a publicly-owned hospital and receives a paycheck from a public employer was acting within the direction and control of her public employer when she engaged in the alleged medical malpractice. Although this question sometimes arises when the alleged malpractice occurs within the publicly-owned hospital where the physician generally performs her clinical duties, it most commonly arises when the alleged malpractice occurs outside the publicly-owned hospital. See generally Kelley v. Rossi, 395 Mass. 659 (1985). In these cases, the question of whether the public employer exercised “direction and control” over the public employee determines whether the physician is personally liable for her alleged negligence, without a damage limit, or whether the physician is immune from personal liability under the Act, leaving the plaintiff the sole recourse of suing the Commonwealth for its employee’s negligence, with a $100,000 cap on any damage award.
The second context arises when a plaintiff seeks to bring a claim for vicarious liability against the hospital or health care provider on the theory that the entity that exercised “direction and control” over the physician is responsible to pay any damages caused by its agent’s negligence. Here, the issue is not whether there will be a $100,000 cap on damages, because the individual physician would remain personally liable to pay any damage award, but whether the hospital or health care provider, with its deeper pocket and perhaps greater medical malpractice insurance coverage, will be jointly responsible to pay any damage award. See generally Hohenleitner v. Quorum Health Resources, Inc., 435 Mass. 424 (2001).
The Supreme Judicial Court has declared that the legal principles are the same in both these contexts: “The legal principles that govern the determination of whether the doctor was a "public employee" of the city and, therefore, freed from liability to the plaintiff by G.L.c. 258, §2, are the same as those that have determined whether an agent is a servant for whose negligent acts a principal may be liable under the common-law doctrine of respondeat superior." Kelley v. Rossi, 395 Mass. at 661. Therefore, in both these contexts, the appellate courts of Massachusetts have asked essentially the same question — who, if anyone, “had power of control or direction over the professional conduct of the physician.” Kapp v. Ballantine, 380 Mass. 186, 195 (1980) (determining whether hospital was vicariously liable for electric shock therapy conducted by doctors on staff of the hospital). Compare with Kelley v. Rossi, 395 Mass. at 664 (determining whether Tort Claims Act applied by asking whether doctor was “subject to the direction and control of the city”).
*382 While the legal principles may be the same in both contexts, the practical consequences are diametrically opposed. In cases alleging the negligence of a physician at a state or city hospital, the plaintiff generally argues that the defendant physician’s public employer did not have power or control or direction over him in order to avoid the $100,000 damages cap under the Act. In cases alleging the negligence of a physician at a privately-owned hospital, the plaintiff generally argues that the defendant physician’s private employer did have power or control or direction over him so that it will be vicariously liable for the physician’s misconduct.
The appellate interpretation and application of these legal principles have been either inconsistent or, at best, difficult to follow. See generally Memorandum of Decision and Order on Defendant Shields Healthcare Group Inc.’s Motion for Summary Judgment, Miller et al. v. Kurkjian et al., Norfolk County Civil No. 95-1723-B (February 19, 1999) (Gants, J.) (9 Mass. L. Rptr. 591) (surveying the history of this case law). The Supreme Judicial Court in 1985 interpreted “direction and control” to mean control over the details of the physician’s treatment of a patient.
It is true, however, that the very nature of a physician’s function tends to suggest that in most instances he will act as an independent contractor. Another person, unless a physician himself, would have no right (or desire) to exercise control over the details of the physician’s treatment of a patient; the profession is distinct and requires a high level of skill and training; and the physician must use independent judgment. . . There is some authority for the proposition that a physician is not a servant where the principal cannot control the details of the physician’s activities.
Kelley v. Rossi, 395 Mass. at 662. See also Zucco v. Kane, 55 Mass.App.Ct. 76, 86 (2002); Chase v. Independent Practice Association, Inc., 31 Mass.App.Ct. 661, 665 (1991). More recently, the Supreme Judicial Court interpreted “direction and control” to mean the “right to control the physical conduct of [the nurse or doctor] in the course of her treatment of patients in short, her clinical care.” Hohenleitner, 435 Mass. at 436. It is not plain that these standards are identical. To confuse matters further, the Supreme Judicial Court has declared that, when a doctor or nurse is an employee of a hospital, vicarious liability does not require that the master have “the right to control the details of the servant’s activities or his exercise of judgment in carrying out the master’s instructions.” Hohenleitner, 435 Mass. at 431 & 432 n. 6. See also McMurdo v. Getter, 298 Mass. 363 (1937). Yet, the Supreme Judicial Court has also declared that, even when a physician is a salaried employee of a public entity, he will generally be viewed as an independent contractor because of his function as a physician. Williams v. Hartman, 413 Mass. 398, 400-01 (1992).
Pragmatically, this combination of a vaguely worded standard of “direction and control” with judicial interpretations that fail to lend clarity makes it extraordinarily difficult for a trial court to apply these legal principles with confidence.[2] According to Hohenleitner, “direction and control” means the right to control the physical conduct of the physician or nurse in the clinical care of her patients. 435 Mass. at 436. Where, as in Hohenleitner, the defendant entity did not set policy regarding the treatment of patients and did not interfere with the nurse’s or doctor’s interaction with patients or her medical decisions regarding the care of patients, the entity did not have direction and control over the physician. Id. at 435-38. In the case at bar, there is evidence that, after Mr. Daniels’ cardiac arrest, Dr. Lipke remained under the general direction and control of UMMC but was under the special direction of Dr. Desai at Metrowest while the Code Team tried to stabilize Mr. Daniels. Does this mean, as plaintiff contends, that Dr. Lipke was under the direction and control of UMMC generally, but was under the direction and control of Dr. Desai and Metrowest when she helped out as part of the Code Team?
Parsing the legal language used by the appellate courts cannot definitively answer this question. The Supreme Judicial Court has made it clear that more than one entity may have the right to control a physician’s care of her patients at the same time. Id. at 434 & n. 8 (observing that a single act may be done to help two independent employers and that a person may therefore be deemed the servant of two masters). Consequently, it is conceivable that a physician may be under the direction and control of two separate hospitals while caring for a patient.
Even when it is plain that a physician is under the direction and control of only one hospital, there may still be a question of fact as to which hospital has that direction and control. In Kelley, a physician in the pediatrics residency program at Boston City Hospital “rotated” to a private hospital every third or fourth night, and was on rotation at that private hospital when she allegedly breached the standard of care by failing properly to diagnose a patient’s condition in the emergency room at that private hospital. 395 Mass. at 660. The Supreme Judicial Court concluded that there remained a material question of fact as to whether, “while working in the emergency room, the doctor was not subject to the direction and control of the city.” Id. at 664-65. The Court noted that, while in the emergency room of the private hospital, she worked with a pediatrician on the staff of that hospital, that she worked there every third or fourth night on an established schedule, that she was required to follow the policies and procedures of the private hospital while she worked there, and that, if her work were inadequate, she could be terminated by the private hospital from this part of her rotation. Id. at 664.
*383 Perhaps because the standard is so poorly defined, the Appeals Court has noted that “no general rule can be stated for determining vicarious liability in the medical area as the cases are ‘fact specific.’ ” Zucco v. Kane, 55 Mass.App.Ct. at 86, quoting Hohenleitner, 435 Mass. at 438. In view of this ambiguity and the general reluctance of trial courts to resolve matters on summary judgment, it is certainly a plausible course of action, as happened in Hohenleitner, to allow the case to proceed to trial and let the jury determine whether Dr. Lipke was under the direction and control of the UMMC when she cared for Mr. Daniels.
This Court, however, does not find that plausible course to be the wisest. While there is a substantial dispute of fact as to whether Dr. Lipke was negligent with respect to the intubation of Mr. Daniels, there is no significant dispute, at least on this record, as to any factual issue relevant to the question of “direction and control.” The difficulty in determining whether summary judgment is appropriate here, therefore, does not derive from any ambiguity as to the facts; it derives only from ambiguity as to the legal meaning of “direction and control.” It accomplishes nothing to leave this question to the jury because, to be frank, the legal instruction this Court gave the jury in Hohenleitner, which essentially was approved by the Supreme Judicial Court, gave the jury inadequate guidance as to how it should decide this difficult issue.[3] To be blunt, if trained judges have difficulty applying the legal definition of “direction and control,” why should jurors have any less difficulty?
It is the job of the court, not the jury, to eliminate (or at least diminish) the ambiguity as to the legal meaning of “direction and control,” using whatever guidance has been made available by the appellate courts. In determining its meaning, it is critical to keep in mind, first, that the words “direction and control” were chosen by the Legislature in the Tort Claims Act and by the appellate courts under the common law to determine when an entity (public or private) is vicariously liable for the conduct of its employee or independent contractor. Therefore, in determining the meaning of the phrase “direction and control” as applied to claims of medical malpractice, a court is not simply parsing words; it is determining the scope of vicarious liability in the medical community.
In determining the appropriate scope of vicarious liability, courts are essentially making an equitable determination as to which innocent party — the innocent victim of the negligence, the innocent hospital, or, in cases involving public employees, the innocent public employer — should bear the risk of the negligence of the physician. See generally Kansallis Finance Ltd. v. Fern, 421 Mass. 659, 664-65 (1996). The legal principle of “direction and control” essentially means that a hospital is vicariously liable for the negligence of a physician that has privileges at that hospital only when there is something the hospital potentially could have done to avert the negligence. The potential for corrective action need not be so great as to permit the finding that the hospital shared in the blame for the medical malpractice, but it must permit the possibility that there was something the hospital could have done to avert it. When there is such a possibility, vicarious liability provides the financial incentive for the hospital to do whatever it reasonably can to prevent medical malpractice. Where there is no such possibility, vicarious liability yields no such financial incentive because there is simply nothing the hospital could have done. That is why, in Hohenleitner, the Supreme Judicial Court found that vicarious liability should be premised on the right to control a nurse’s clinical care of patients, and why a management company whose contract with the hospital specifically excluded it from control over medical matters could not be vicariously liable for the medical malpractice of a nurse or physician at that hospital. Hohenleitner, 435 Mass. at 436-38.
The important financial consequences of vicarious liability will likely affect the conduct of physicians and hospitals, so it is important that the lines be drawn clearly so that the adaptive behavior is intelligent and efficient. If there is a significant risk that a physician public employee will not be protected from liability under the Act and will instead be personally liable for medical malpractice, he will need to obtain medical malpractice insurance or risk financial ruin. If the physician recognizes that he may not have medical malpractice insurance coverage in certain circumstances, he may be reluctant to furnish medical care under those circumstances, even when his care plainly is medically needed. If a hospital will be vicariously liable for the malpractice of a physician when it grants that doctor staff privileges, it needs to ensure that its insurance coverage is adequate and may limit or impose new conditions on the grant of staff privileges. Physicians and hospitals can adapt to the legal standards imposed provided those legal standards are known, predictable, and functional. Ambiguity breeds confusion and unpreparedness, which serves no one’s interest.
Applying these considerations, this Court interprets Hohenleitner and its progeny to declare that a hospital, public employer, or other entity is vicariously liable for the medical malpractice of a physician or nurse when it has the right or power to discipline the physician or nurse for that alleged misconduct, either by termination, withdrawal of privileges, or other sanctions. Essentially, if the hospital would conduct a peer review of a physician’s or nurse’s alleged medical error under G.L.c. Ill, §203, it is vicariously liable for that error. This more precise definition conforms with the more general definition in Hohenleitner that focuses on the “right to control the physical conduct of [the physician or nurse] in the course of her treatment of patients . . ., in short, her clinical care.” 435 *384 Mass. at 436. A hospital that cannot discipline a doctor cannot be said to have a right to control her clinical care; a hospital that can discipline a doctor, by the mere possibility of discipline, has such a right. This more precise definition is also more functional and clear. Hospitals know whom they may discipline, and doctors know who can discipline them, so all can adapt to the clearer lines drawn as to vicarious liability. Indeed, hospitals are required by law to participate in risk management programs approved by the Board of Registration, and procedures governing who is subject to medical peer review and under what circumstances may be part of such programs.
Applying this definition to the case at bar, it becomes plain that Metrowest would not and could not attempt to discipline Dr. Lipke for her alleged negligence in the care of Mr. Daniels in the emergency room on May 23, 1996. She had no relationship to Metrowest apart from happening to be in its emergency room to transport Mr. Daniels, and participating in his care when his breathing appeared unstable and he suffered a cardiac arrest. The evidence is clear, however, that UMMC could discipline Dr. Lipke for any alleged negligence that occurred in the Metrowest emergency room because it occurred during the course of her emergency medical duties while assigned to staff the Life Flight that evening. Therefore, with respect to the clinical care she provided to Mr. Daniels in the Metrowest emergency room, she remained under the “direction and control" of UMMC, not Metrowest or Dr. Desai, and therefore is immune from liability under the Tort Claims Act. The plaintiffs motion to amend to add Dr. Lipke as a defendant, therefore, must be denied.
There is a second separate and distinct ground on which to deny the plaintiffs motion to amend. The plaintiffs only allegations of medical malpractice as to Dr. Lipke involve her decision to intubate Mr. Daniels and the procedure she used to intubate him during the five attempts. On the undisputed record before this Court, however, Mr. Daniels’s cardiac arrest and the code that followed occurred after he was finally successfully intubated on the fifth attempt. Dr. Desai returned to the emergency room to resume his care of Mr. Daniels only as a result of the code. There is nothing that Dr. Lipke did or failed to do while Dr. Desai was present and in charge of the Code Team that the plaintiff alleges to have breached the standard of care. Consequently, even if, as plaintiff contends, Dr. Lipke was under the “direction and control” of Metrowest and/or Dr. Desai, not UMMC, when she participated in the Code Team, she is not alleged to have committed medical malpractice during the Code Team’s care of Mr. Daniels. The only negligence alleged against her occurred prior to the code, when she remained under the “direction and control” of UMMC, not Metrowest or Dr. Desai. Since the question of “direction and control” focuses on the time of the allegedly negligent care provided by the physician, and since it is undisputed that she was under UMMC’s sole “direction and control” prior to Mr. Daniels’ cardiac arrest, she was under UMMC’s “direction and control” when she allegedly committed the medical malpractice.
ORDER
For the reasons stated above, the plaintiffs motion to amend the complaint to add Dr. Lipke as a defendant is DENIED.

The plaintiff, through her attorney, has told the Court that she would move to amend to add the Commonwealth of Massachusetts as a defendant if Dr. Lipke were not added individually as a defendant. This Court takes no position as to whether any such motion to amend would be allowed.

Nowhere is this difficulty better demonstrated than in Hoherdeitner, the Supreme Judicial Court’s most recent decision on this issue, which concerned a jury trial over which I presided in 1999. Unable from the appellate guidance to provide a more detailed definition of “direction and control” with any confidence, I informed the jury in my closing jury instructions:
Quorum, as a management company retained by Quincy Hospital to act as manager of that hospital, is legally responsible for the negligence of a nurse like [Farrag] who was employed by the Quincy Hospital only if it had the right or the power to control or direct the manner in which the nurse provided treatment to patients in the emergency room at [the hospital]. In other words, Quorum is legally responsible for [Farrag’s] negligence only if Quorum had the right or the power to control or direct Nurse Farrag’s conduct as a nurse in the emergency room at [the hospital]
435 Mass. at 430 n. 3 (2001). The question for the jury mirrored this minimalist instruction, asking, “Did the defendant, Quorum Health Resources, Inc., have the right or the power to control or direct tire manner in which Nurse Linda Ferrag provided treatment to patients in the Emergency Room at Quincy City Hospital?” Id. While no objection was made either to this instruction or question at trial, the Supreme Judicial Court observed:
. . . the case was given to the juiy on a special question, which is, at the same time, more limited than the legal implications underlying the principles asserted by the plaintiff, yet broader than the standard for establishing liability implicated by the principles now espoused by Quorum.
Id. at 433. Yet, at the close of its decision, the Supreme Judicial Court declared that." . . the special question posed to the jury . . ., in these circumstances, was substantially correct." Id. at 436. Having said this, the Court added in footnote:
Nevertheless, the wording of the special question posed to the jury, specifically, the phrase, “the manner in which [Farrag] provided treatment to patients in the Emergency Room,” is slightly ambiguous. In view of the judge’s instruction that “Quorum is legally responsible for [Farrag’s] negligence only if Quorum had the right or the power to control or direct [Farrag’s] conduct as a nurse in the emergency room at [the hospital],” we interpret the question’s scope to include the details of Farrag’s interaction with patients in the emergency room, but not necessarily to include her actual clinical decisions.
Id. at 436 n. 10.

Indeed, this Court allowed judgment notwithstanding the verdict in Hoherdeitner precisely on the issue of direction and control, and that reversal of the jury’s decision was upheld by the Supreme Judicial Court.