JEANNE E. GUGINO *vs.* HARVARD COMMUNITY HEALTH PLAN
& others.

Suffolk. February 5, 1980. — April 23, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Medical Malpractice*, Tribunal, Bond. *Negligence*, Medical malpractice.

The offer of proof by the plaintiff, a member of a health plan, of negli-
gence by it and by a doctor and nurse practitioner with respect to a
certain intrauterine contraceptive device implanted in the plaintiff
two years before she was assigned to the doctor and consulted him and
the defendant nurse was sufficient, if properly substantiated, to raise a
legitimate question of liability appropriate for judicial inquiry under
G. L. c. 231, § 60B, where, in addition to medical articles introduced
warning of the hazards and "serious complications" likely to result, the
plaintiff's expert expressed opinions that the defendants were negligent
in failing to inform the plaintiff of the risks, that the management of
the case by the defendant nurse was clearly in error, and that a critical
delay in scheduling diagnosis and treatment by the defendants was the
factor which caused the need for a total hysterectomy undergone by
the plaintiff. [465-469]

Upon a finding for the defendants, a health plan and two of its employ-
ees, in an action for medical malpractice by a member of the plan, and
a determination by the judge presiding over the medical malpractice
tribunal established under G. L. c. 231, § 60B, that the plaintiff was
indigent, a determination fully supported by her affidavit, it was an
abuse of discretion on the part of the judge to order that she file a bond
of $1,500 as to each defendant under the pursuit of claims provision in
the statute. [469]

CIVIL ACTION commenced in the Superior Court on June
27, 1977.

A motion to strike findings of a medical malpractice tri-
bunal was heard by *Jablonski*, J., a District Court judge sit-
ting under statutory authority.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*Alanna G. Cline* for the plaintiff.

*Marcia Sneden* for the defendants.

BRAUCHER, J.  The plaintiff seeks to recover damages for personal injuries as a result of the alleged malpractice of the defendants with respect to an intrauterine contraceptive device, the Dalkon Shield.  A medical malpractice tribunal convened pursuant to G. L. c. 231, § 60B, found that the plaintiff's offer of proof "is not sufficient to raise a legitimate question of liability appropriate for judicial inquiry." On the plaintiff's motion, the judge who sat with the panel reduced the bond to be filed by the plaintiff to the sum of $1,500 as to each defendant.  A single justice of the Appeals Court gave the plaintiff leave to file an interlocutory appeal, and we transferred the case to this court on our own motion.  We hold that the decision of the tribunal was erroneous, and order the entry of a decision that the plaintiff's offer of proof was sufficient.  We also indicate that the requirement that bonds in the amount of $4,500 be filed by an indigent plaintiff constituted an abuse of discretion.

The plaintiff's complaint, filed June 27, 1977, as later amended, made claims against the Harvard Community Health Plan (Plan) and two of its employees, Dr. Thomas Mahoney and Susan Daggett, R.N., a nurse practitioner. Additional claims against the doctor who inserted the device were voluntarily dismissed without prejudice, and claims against the manufacturer of the device were not submitted to the tribunal.  The tribunal was convened in May, 1978, consisting of the judge, a lawyer and a gynecologist, and it filed its findings in June, 1978.

1.  *The offer of proof.*  We summarize the plaintiff's offer of proof, consisting of her affidavit and the affidavit of an expert witness, copies of medical records, and articles from newspapers and medical periodicals, together with oral representations of counsel.  The device was implanted in 1972.  In June, 1974, the plaintiff was a member of the Plan, assigned to the defendant doctor.  She read an article in the New York Times concerning the Dalkon Shield, and on June 27, 1974, she consulted the doctor as to the risks of

pregnancy and infection, telling him that she was experiencing dysfunctional bleeding. The doctor advised her that he knew of no pregnancy or infection problems associated with the device, and reassured her as to its use.

In mid-April, 1975, the plaintiff began to experience a foul vaginal odor like that of dead fish. She called the Plan for an appointment and was told by the defendant nurse to douche with yogurt. A little over a week later she developed intense pain and again called the Plan. She said, "I'm having a baby, only I am not pregnant. Do you know what I mean." The defendant nurse said she probably had a lower G.I. flu and should call back if she developed a fever. On April 30, 1975, when she kept a scheduled appointment at the Plan, the plaintiff could hardly walk; the device was removed and she was given an antibiotic and a painkiller and told to return May 2. She did so, multiple abscesses were diagnosed, and on May 5 she underwent a total hysterectomy.

The plaintiff's expert is a licensed physician and a primary care internist with considerable experience in working with and supervising nurse practitioners. After reviewing the available medical records and the plaintiff's statements, he expressed the following opinions, among others. The defendant doctor and defendant nurse were under a continuing obligation to inform the plaintiff of the risks known to be associated with the Dalkon Shield. Failure so to inform the patient was negligence, and omission of such disclosure in June, 1974, probably determined the plaintiff's retention of the device and contributed to the infection. The management of the plaintiff's case by the defendant nurse, months later, was clearly in error; a yogurt douche is a substandard lay remedy, inappropriate for an odor of dead fish. Delay of more than forty-eight hours in scheduling diagnosis and treatment was substandard care. The time factor was critical, and each day of delay increased the likelihood of surgery; this critical delay was the factor which caused the need for a total hysterectomy.

An article published in 1973 reported that "an increasing number of IUD users were complaining of a persistent vaginal odor like that of rotting fish, which was resistant to all forms of local therapy," and concluded that patients should be advised of "the potential serious hazards of the IUD" and "instructed to notify their physician immediately upon the appearance of abnormal bleeding, foul-smelling leukorrhea, or persistent pelvic pain." Golditch & Huston, Serious Pelvic Infections Associated with Intrauterine Contraceptive Device, 18 Int. J. of Fertility 156-160 (1973). An article in the New York Times in June, 1973, mentioned "serious complications," including infection and heavy bleeding, encountered with IUDs, but concentrated more on pregnancy risks. New York Times articles in May, 1974, warned of risks of infection in cases of women who became pregnant while wearing a Dalkon Shield, and a later article reported that the device was withdrawn from the market in 1974. Subsequent articles in medical journals analyzed both pregnancy and infection problems, and tended to confirm the opinion of the plaintiff's expert as to causation.

The plaintiff's expert complained that his evaluation of the case was frustrated by the "very sketchy nature" of the Plan's records. We have examined those records, and find it impossible to tell how "sketchy" they are, since many of them are almost totally illegible. No records of telephone calls were submitted by the defendants, and counsel for the defendants doubted that any record of such calls was made. The defendants admitted that the defendant doctor and the defendant nurse were employees of the Plan, and that they rendered medical care to the plaintiff.

2. *Sufficiency of the offer.* We recently discussed the standard of review applicable to the finding of a medical malpractice tribunal. *Kapp* v. *Ballantine, ante* 186, 191-193 (1980). Much of that discussion is applicable to the present case, but it need not be repeated here. The plaintiff complied with G. L. c. 231, § 60B, which contemplates that the plaintiff present, not mere allegations or an oral offer of proof by counsel, but "evidence" to be "properly substan-

tiated" at trial. See *id.* at 190 n.4. The witnesses need not testify in person, and allowance should be made for the fact that the hearing before the tribunal ordinarily precedes discovery. In particular, inadequacies in defendants' records should not disadvantage the plaintiff.

The applicable standard is comparable to that applied to a defendant's motion for a directed verdict, and appraisal of the weight and credibility of the evidence is impermissible. *Id.* at 190. The offer of proof prevails against a defendant doctor if there is evidence of (1) a doctor-patient relationship, (2) the doctor's failure to conform to good medical practice, and (3) resulting damage. *Id.* at 193. A similar standard applies to the defendant nurse and to the Plan; in addition, if the Plan is to be held vicariously liable, there must be a factual basis for inferring that the Plan had power of control or direction over the conduct in question. *Id.* at 195.

The defendants argue that the offer of proof fails to provide a factual basis for the opinions of the plaintiff's expert with respect to the duration of the plaintiff's infection or the dates of her contacts with the Plan. But the expert's affidavit recites his review of the plaintiff's statements of events as well as her medical records, and her affidavit sufficiently describes the dates in question to provide the basis for the expert's opinions. To disregard the plaintiff's statements as to telephone calls because the defendants have no record of such calls would be to engage in impermissible appraisal of the weight and credibility of the evidence.

The briefs of the parties do not point to any other specific defects or omissions in the plaintiff's offer of proof. The finding of the tribunal consists entirely of the statutory conclusion, without explanation. In this situation we are not required to search for possible defects or to rule upon contentions not made by the parties. We conclude that the evidence was sufficient, if properly substantiated, "to raise a legitimate question of liability appropriate for judicial inquiry." G. L. c. 231, § 60B. Hence the contrary decision of the tribunal was erroneous and should be struck from the record;

and the required decision should be entered in lieu thereof. *McMahon* v. *Glixman*, 379 Mass. 60, 66 (1979).

3. *The amount of the bond.* In view of our decision on the sufficiency of the offer of proof, we need not pass on the judge's ruling with respect to the amount of the bond. But the question has been fully argued and is likely to recur, and we express our opinion.

The plaintiff moved to waive or reduce the bond to be filed by her. Her affidavit, dated July 5, 1978, showed that she was unemployed for eleven months, until June 12, 1978, had depleted all savings, owed $980, and owned no valuable property; she was a C.E.T.A. (a federally funded training program) employee at a take-home salary of $175 a week, but had not received her first pay check. Counsel suggested that she could post a $500 bond within two weeks. The judge ordered that she file a bond of $1,500 as to each defendant, a total of $4,500.

Since the statute provides for reduction of the amount of the bond only upon a determination that the plaintiff was indigent, the judge's order implies such a determination. Her affidavit fully supported such a determination. In upholding the constitutionality of the statute, we relied on the provision giving the judge discretion as to the amount of the bond. *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 653-654 (1977). We said, "The $2,000 level is not unreasonably burdensome for nonindigent plaintiffs whose claims have already been the subject of adverse findings by the statutory tribunals." But we made no similar statement as to indigent plaintiffs, and we think a requirement of bonds in the amount of $4,500 was unreasonably burdensome for the present plaintiff in the circumstances disclosed in her affidavit. Hence the imposition of that requirement constituted an abuse of discretion.

4. *Disposition.* The orders requiring the plaintiff to file bonds are to be vacated. A finding and decision are to be substituted therefor that upon the offer of proof presented by the plaintiff, including written reports and affidavits, the evidence thus offered and presented, if properly sub-

stantiated, is sufficient to raise a legitimate question of liability appropriate for judicial inquiry. The case is to be remanded to the Superior Court for further proceedings therein.

*So ordered.*