## Carolyn D. Hohenleitner *vs.* Quorum Health Resources, Inc.

Middlesex. October 4, 2001. - November 28, 2001.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Negligence,* Nurse, Vicarious liability, Hospital management corporation. *Nurse. Agency,* What constitutes. *Evidence,* Of agency.

Discussion of principles of agency law, including the standard for establishing a master-servant relationship for the purpose of imposing vicarious liability on a health care entity for negligence arising from clinical care judgments made by a nurse in the course of patient treatment. [430-436]

At the trial of a complaint brought by a patient against a hospital's management corporation, for injuries caused by the negligence of an emergency room nurse, the special question posed to the jury regarding the corporation's vicarious liability for the nurse's conduct (i.e., whether the corporation had "the right or the power to control or direct the manner in which [the nurse] provided treatment to patients") was substantially correct. [436]

A hospital management corporation's assumption, under a contract with the city of Quincy, of the administration and management of a hospital owned by the city, did not give rise to vicarious liability on the corporation's part for the negligence of a hospital nurse (a city employee) in treating a patient, where the corporation did not have the right to set hospital policy regarding the treatment of patients, and where the city retained control over clinical and medical matters at the hospital. [436-439]

Civil action commenced in the Superior Court Department on January 20, 1994.

The case was tried before *Ralph D. Gants*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Robert C. Zaffrann* for the plaintiff.

*Lauren A. Cleary* for the defendant.

Greaney, J. A jury in the Superior Court returned a special verdict awarding damages to the plaintiff against the defendant, Quorum Health Resources, Inc. (Quorum). The jury found that a nurse, Linda Farrag (Farrag), who was employed by the city

of Quincy (city), and working in the emergency room of Quincy City Hospital (hospital), had negligently injured the plaintiff. The jury's damages were based on a written finding by them that, despite the city's employment of Farrag, Quorum was vicariously liable because Quorum had "the right or the power to control or direct the manner in which . . . F[a]rrag provided treatment to patients in the Emergency Room at [the hospital]." The trial judge allowed Quorum's motion for judgment notwithstanding the verdict, Mass. R. Civ. P. 50 (b), as amended, 428 Mass. 1402 (1998). The judge concluded, in his written memorandum of decision, that the plaintiff's evidence was insufficient, as matter of law, to support the jury's special finding quoted above. The plaintiff appealed from the judgment for Quorum, and we allowed her application for direct appellate review. We now affirm the judgment.

1. Under the standard applicable to a motion for judgment notwithstanding the verdict, see *Cambridgeport Sav. Bank* v. *Boersner*, 413 Mass. 432, 438 (1992), we set forth the evidence in the light most favorable to the plaintiff. Shortly after midnight on January 22, 1991, the plaintiff, experiencing severe angina pain and believing that she was having a heart attack, dialed 911. She was taken by ambulance to the emergency room of the hospital, arriving at roughly 12:35 A.M. On her arrival, she was placed in a medical treatment room and interviewed by Farrag, the registered nurse in charge of triage. Farrag administered oxygen to the plaintiff, connected her to a portable cardiac monitor, and left her alone in the room with a curtain drawn, at least partially, around her bed. Although an electrocardiogram (EKG) machine subsequently attached by Farrag revealed that the plaintiff was suffering a myocardial infarction, the plaintiff did not see a doctor until 1:17 A.M. While giving her medical history to that doctor, she suffered a cardiac arrest, and, later that morning, she suffered a second cardiac arrest. The plaintiff survived, but her heart was irreversibly damaged. There is no dispute that the plaintiff's evidence warranted the jury's findings that Farrag was negligent (either in failing promptly to provide the plaintiff with the EKG machine, failing promptly to interpret the EKG accurately, or failing promptly to summon the emergency room doctor), that her negligence caused injury

to the plaintiff, and that the plaintiff was not comparatively negligent.

The critical question put to the jury concerned Quorum's right to control or direct Farrag's treatment of the plaintiff in the emergency room. We set forth the evidence regarding Farrag's employment status and the relationship between Quorum, the city, the hospital, and the hospital staff. Farrag was hired and paid by the city and assigned to work in the emergency room of the hospital. The hospital, a 334 bed acute care facility, in turn, is a municipal entity owned by the city and operated by the mayor, through a nine-member board of managers (board) appointed by him from the citizens of Quincy.

At the time of the plaintiff's injury, the hospital was operated by Quorum under a written "Contract for Professional Services," executed on January 3, 1989, between the city and Quorum's predecessor in interest. The contract's provisions put before the jury were as follows:[1]

(a) Quorum was to act for the city as the "manager" of the hospital. Quorum's employees were not deemed "employee[s] of [the city], except as may be required by law." Quorum and the city were not considered "partners or joint venturers in the operation" of the hospital. Quorum was to be "the agent of the [c]ity only for the purpose of carrying out its obligations" as agent under the contract.

(b) Quorum had general authority and responsibility "to conduct, supervise, and manage the day-to-day operations of the [h]ospital." Quorum had the specific authority and responsibility for the supervision and management of all employees of the hospital, including the determination of numbers and qualifications of employees needed in the various departments and services of the hospital; the job and position descriptions for all employees of the hospital; the establishment of wage scales, rates of compensation, employee benefits, and rates and conditions of employment; employee in-service training and employee attendance at seminars and conferences; and staffing

---

[1]Other, arguably pertinent provisions of the contract that the jury should have had an opportunity to consider were not admitted in evidence. The provisions were excluded by the judge based on a motion in limine as explained more particularly in note 2, *infra*.

schedules. All of these responsibilities were subject to the approval of the city, applicable statutes, and collective bargaining agreements. Quorum also had the authority and responsibility to evaluate all quality control aspects of the hospital operation and to implement, with board approval, "quality control programs designed to meet standards imposed by appropriate certifying agencies and to bring about a high standard of health care in accordance with [b]oard policies and resources available to the [h]ospital."

(c) To perform these duties, Quorum was to provide five employees to work at the hospital. These employees were (1) a director or chief hospital administrator, to serve as the hospital's chief administrative officer (director); (2) a chief financial officer, to serve as the hospital's chief accounting and financial officer; (3) a controller, to serve as the hospital's accounting manager; (4) a patient accounts manager, to serve as the hospital's business office manager; and (5) an associate director for patient services, to serve as the hospital's director of patient services. The "initial and continuing appointment" of these employees were "subject to the approval of the [city through the hospital's] [b]oard of [m]anagers," and the employees, as indicated above, were Quorum's employees, not the city's.

(d) The mayor and the board (with the mayor's express or implied approval) retained "all authority placed in the office of the [m]ayor by the laws of the Commonwealth, the amended ordinances of the [c]ity . . . , and any applicable regulations."

(e) Quorum was to provide administrative support to, and consult with, the hospital's medical staff for its organizational activities and interrelationships with the hospital. "All medical and professional matters shall be the responsibility of the [b]oard of [m]anagers and the [m]edical [s]taff of the [h]ospital."[2]

In her testimony, Ellen M. Zane, a Quorum employee, and

[2]These are the provisions of the contract that were admitted in evidence. The judge allowed the plaintiff's motion in limine to redact other provisions of the contract. Removed from the jury's consideration were provisions that (a) permitted the city to add Quorum as an additional insured on any liability insurance policy purchased by the city; (b) stated that, except for the five employees of Quorum retained to manage the hospital, no other person employed by the hospital was to be deemed a Quorum employee; (c) provided that Quorum was to have "no liability whatever for damages suffered on ac-

under the contract, the director of the hospital at the time Farrag's negligent conduct occurred, disclaimed any responsibility on the part of Quorum for clinical treatment decisions and practices by the city's employees at the hospital. According to Zane, the city paid Quorum to ensure that administrative procedures were in place to ensure quality patient care. Quorum managed and supervised the hospital operations on a day-to-day basis, and Zane was in charge of overseeing that operation. Although, as a practical matter, decisions typically were made by Zane's subordinates at the hospital, Quorum had the responsibility to ensure that the hospital had the proper resources to deliver patient care; to set staffing schedules and to ensure that proper levels of staffing qualification were met; to manage the supervisors at the hospital, including the administrator of nursing; to establish in-service training programs and require attendance at seminars and conferences for nurses and other employees; and to implement quality control programs where necessary to ensure a high quality of health care at the hospital, as determined by the medical staff and the board. Quorum, in essence, was responsible for making sure that nurses and other persons making medical decisions were familiar with hospital policy and had the resources available, and were sufficiently trained and qualified, to make proper medical decisions.

Zane denied that she had any authority to "change the clinical efficacy of what was being done for a patient." Zane testified that, although it was Quorum's responsibility to ensure that the clinical or medical policy as determined by the board was carried out and her responsibility as the director to address clinical problems (such as mistakes being made or a nurse's failing to follow the hospital policy), she could not "turn around and ask a nurse to change something. . . . it was counter to hospital policy." She stated that it was Quorum's responsibility to evaluate "[o]nly the administrative piece, not the clinical

count of the . . . negligence of any employee of the [h]ospital or any member of the [b]oard or the [m]edical staff"; and (d) required the city to indemnify Quorum for "all damages [incurred by Quorum] arising from the illegal, negligent, or intentional acts or omissions of [the city] or [its] agents, employees, affiliates, board members, or medical staff." The judge's ruling excluding these terms of the contract was accepted by Quorum's counsel and, as a result, is not challenged on appeal.

piece," of quality control of the hospital. Zane acknowledged that she periodically made rounds at the hospital in order to talk to various employees about "what was wrong with the hospital," and, if she had been advised that nurses at the hospital were not familiar with hospital policy or with proper standards of health care, she could have directed that procedures be implemented to correct the problem.

Zane described the hierarchy of supervision for nurses of the hospital's emergency room that was in place in 1991 in the following manner. A staff nurse reported to a charge nurse (the position held by Farrag at the time her negligence occurred), who was responsible for a particular shift's coverage activities. The charge nurse reported to a nurse manager, who was the department head responsible for the emergency department irrespective of a particular shift. The nurse manager reported to the associate director of nursing, who reported to the director of nursing, who, in turn, reported to the associate director for patient care (a Quorum employee). The associate director for patient care reported directly to Zane.

Zane testified, however, that it was not Quorum but the medical staff, consisting largely of independent physicians who were not hospital employees, who had responsibility for responding to clinical concerns. Zane indicated that "the medical staff would report directly to the board relative to what . . . clinical issues needed to be [addressed], the board would set the policy relative to [the issues], and then [Quorum was] to do everything we could administratively to implement that [policy] to make sure the board's edicts were put in place." According to Zane, Quorum's lack of responsibility for individual patient care decisions was confirmed by the contract provision delegating the responsibility of all medical and professional matters to the board and the medical staff. There was no evidence contradicting this.

2. With the evidence in this posture, the case was put to the jury with regard to Quorum's liability for Farrag's conduct under the special question asking whether Quorum had "the right or the power to control or direct the manner in which . . . [Farrag] provided treatment to patients in the Emergency Room at [the hospital]." The only instructions given to the jury on the

question are set forth below,[3] and, as can be seen, the instructions generally repeat the substance of the question. The question, and the instructions pertaining to it, were agreed to by both counsel for the plaintiff and counsel for Quorum. As has been mentioned, the judge set aside the verdict based on his conclusion that the plaintiff's evidence was insufficient, as matter of law, to warrant the jury's affirmative answer to the question. We now proceed to explain why we conclude that the jury's affirmative answer to the question cannot in law sustain their verdict.

3. On appeal, the plaintiff argues that Quorum could be held vicariously liable if it had the right to exercise control over the "general activities of [Farrag] . . . from which her negligent conduct arose." In order to establish a master-servant relationship for purposes of vicarious liability, according to the plaintiff, it is not necessary that Quorum have the ability to control or direct Farrag's professional judgment or medical decisions made in the course of treating a patient. The plaintiff contends that it is sufficient that Quorum had the right to supervise the nursing staff, including Farrag, to determine specifics such as when, where, and on which patients Farrag worked, and that Quorum had numerous other aspects of control over the details of Farrag's "general activities."

Quorum takes a different tack, and claims that, in order to be

---

[3]The judge instructed the jury in the following manner:

"Quorum, as a management company retained by Quincy Hospital [*sic*] to act as manager of that hospital, is legally responsible for the negligence of a nurse like [Farrag] who was employed by the Quincy Hospital [*sic*] only if it had the right or the power to control or direct the manner in which the nurse provided treatment to patients in the emergency room at [the hospital].

"In other words, Quorum is legally responsible for [Farrag's] negligence only if Quorum had the right or the power to control or direct Nurse Farrag's conduct as a nurse in the emergency room at [the hospital]. . . .

"[T]he question [of legal responsibility] asks, 'Did [Quorum], have the right or the power to control or direct the matter in which [Farrag] provided treatment to patients in the emergency room at [the hospital]?' And your answer to that is yes or no."

held vicariously liable, it must have the right to control the details of Farrag's patient care activities, including her actual clinical judgment.[4] Quorum asserts that, to impose vicarious liability on a health care entity for a physician's or nurse's negligence, there must be evidence that the entity had the right to control the professional conduct in question. See *Gugino* v. *Harvard Community Health Plan*, 380 Mass. 464, 468 (1980); *Kapp* v. *Ballantine*, 380 Mass. 186, 195 (1980). See generally *Khoury* v. *Edison Elec. Illuminating Co.*, 265 Mass. 236, 238 (1928). Because the conduct in question (Farrag's perception of the urgency of the plaintiff's condition, her decision on performing an EKG, and her timing in summoning a physician after obtaining EKG results) involved clinical care judgments in the course of treating patients, which Quorum had no ability to direct or control, Quorum argues that vicarious liability cannot, as matter of law, be imposed.

The plaintiff has expressed generally correct principles of agency law: in order to establish a so-called master-servant relationship that may give rise to vicarious liability, it is not necessary that the master have the right to control the details of the servant's activities or his exercise of judgment in carrying out the master's instructions. See *Konick* v. *Berke, Moore Co.*, 355 Mass. 463, 468 (1969) (parting with previous decisions such as *Khoury* v. *Edison Elec. Illuminating Co.*, *supra*, which held master-servant relationship requires right to control "manner and means (the details, in other words)" of servant's work). As the *Konick* decision stated: "Control or the right to control the manner or means of performing the task hardly seems decisive. If the relationship of master and servant exists and if what the employee is doing is in the furtherance of the master's business, i.e., in the scope of employment, the law gives the master the right of direction and control." *Id.* at 467-468, quoting *Hinson* v. *United States*, 257 F.2d 178, 181 (5th Cir. 1958). See Restatement (Second) of Agency § 220(1) comment d (1958) ("[C]ontrol needed to establish the relation of master

---

[4]Quorum's argument, as expressed in various portions of its brief and at oral argument, is that vicarious liability in these circumstances must be based on the right to control a nurse's "clinical care judgments," "professional conduct," "triage decisions," "clinical nursing care activities," and "actual conduct alleged to be negligent," including "actual medical decisions made."

and servant may be very attenuated. . . . [T]here may even be an understanding that the employer shall not exercise control").[5]

Quorum's legal position is less persuasive. The decisions cited by Quorum stand for the generally accepted proposition that a physician performing medical services in a hospital acts as an independent contractor, and not as a servant of the hospital, unless the hospital has the power of control or direction over the physician's professional conduct. See *Harnish* v. *Children's Hosp. Med. Ctr.*, 387 Mass. 152, 159 (1982); *Gugino* v. *Harvard Community Health Plan, supra*[6]; *Kapp* v. *Ballantine, supra*; *Benson* v. *Massachusetts Gen. Hosp.*, 49 Mass. App. Ct. 530, 534 n.6 (2000); *Chase* v. *Independent Practice Ass'n*, 31 Mass. App. Ct. 661, 666 (1991). These cases are inapposite. Although the very nature of the medical profession suggests that, in most instances, a physician acts as an independent contractor, see *Kelley* v. *Rossi*, 395 Mass. 659, 662 (1985), there is hardly any question that a member of a hospital's nursing staff is a servant of the hospital. Moreover, cases involving the issue of a physician's immunity from tort liability under G. L. c. 258, § 2, but based on the same legal principles that govern this case, indicate that a physician may be deemed a servant where the hospital controls details of the physician's physical activities. See *Hopper* v. *Callahan*, 408 Mass. 621, 634 (1990); *Kelley* v. *Rossi, supra* at 661-663. See also *McMurdo* v. *Getter*, 298 Mass. 363, 364-365 (1937) (concluding that physician paid weekly salary to prescribe

[5]In a tentative draft of the Restatement (Third) of Agency, dated March 14, 2001, the American Law Institute departs from the traditional terminology of "master" and "servant" and uses the terms "employer" and "employee" in defining the doctrine of respondeat superior. See Restatement (Third) of Agency § 2.04 and comment a (Tent. Draft No. 2 2001). The drafters of the revised Restatement have not yet reached the stage where principles possibly applicable to the facts of this case have been expressed.

[6]We disagree with Quorum's apparent assertion that, in order to establish a master-servant relationship between a nurse and a hospital for purposes of vicarious liability, there must be proof of the hospital's control over the nurse's professional conduct. In *Gugino* v. *Harvard Community Health Plan*, 380 Mass. 464, 468 (1980), this court stated only that the same standard of review applies to a medical malpractice tribunal's findings regarding claims against a physician and a nurse, and that, if their health plan employer "is to be held vicariously liable, there must be a factual basis for inferring that [the health plan] had power of control or direction over the conduct in question."

eyeglasses was servant of defendant optician firm). This is true even though a hospital can never control the independent medical judgment of a physician. See *McNamara* v. *Honeyman*, 406 Mass. 43, 48 (1989).

These are the abstract general principles argued by the parties. The obvious difficulty in both their positions is that the case was given to the jury on a special question that is, at the same time, more limited than the legal implications underlying the principles asserted by the plaintiff, yet broader than the standard for establishing liability implicated by the principles now espoused by Quorum.

Because no objection was made, the question posed to the jury became the "law of the case," so long as it is not patently incorrect. See *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 559, cert. denied, 516 U.S. 931 (1995); *United States* v. *Zanghi*, 189 F.3d 71, 79 (1st Cir. 1999), cert. denied, 528 U.S. 1097 (2000). We therefore consider whether the jury's affirmative answer to the special question has a basis, sufficient in law, to hold Quorum responsible for damages to the plaintiff caused by Farrag's misconduct.

4. This case does not fit comfortably into any recognized niche of our common law of agency. Agency principles were designed to examine conduct encompassing more traditional relationships in employer-employee arrangements. In *Konick* v. *Berke, Moore Co., supra,* for example, the case on which the plaintiff premises a major part of her argument, a salaried employee of the defendant company, instructed by his supervisor to "jump in the car and get the payroll" at the company's office, negligently injured the plaintiff while carrying out that task. *Id.* at 464. The issue before the *Konick* court was simply whether the employee was acting as a servant or as an independent contractor at the time of his wrongdoing. See *id.* at 468 (holding employee was servant because he had been instructed to do particular job, notwithstanding that he had not been instructed on "manner" of driving). This decision is not readily helpful here, where Farrag was employed by the city, and not by Quorum.

The plaintiff urges us to consider Farrag as a "borrowed servant," lent by the city to Quorum and thus becoming, with

respect to her nursing duties in the emergency room, the employee of Quorum. See *Coughlan* v. *Cambridge,* 166 Mass. 268, 277 (1896) ("one who is the general servant of another may be lent or hired by his master to another for some special service, so as to become as to that service the servant of such third party"). See also Restatement (Second) of Agency, *supra* at § 227.[7] Our test for determining borrowed servant status is "whether, in the particular service which [the person] is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired." *Coughlan* v. *Cambridge, supra.* See *Galloway's Case,* 354 Mass. 427, 430 (1968). This test sheds no light on the issue before us, however, because it merely restates the general rule of control necessary to establish a master-servant relationship. The rule is simple; the difficulty is in its application to the relationship between Farrag, the hospital, the city, and Quorum. The reality is that, in performing her duties as a nurse in the hospital's emergency room, Farrag was employed by the city, but, at the same time, under the direction of Quorum. Farrag had, in a sense, two masters.[8]

Facts similar to those of this case were presented in *Cahill* v. *HCA Mgt. Co.,* 812 F.2d 170 (4th Cir. 1987), and the plaintiff points to it as persuasive authority. In *Cahill,* the United States Court of Appeals for the Fourth Circuit considered whether, under North Carolina common law, a hospital management corporation (HMC) that had undertaken to manage a hospital could be held vicariously liable for the negligence of a medical

---

[7]The judge concluded in his memorandum of decision that the five personnel supplied by Quorum to serve in administrative positions at the hospital were actually "borrowed servants" of the city. We are skeptical of this analogy. The contract plainly indicates that it was Quorum, and not the five employees, that assumed responsibility to manage the hospital.

[8]Because the hospital is not a defendant in this action, we need not explore the applicability of the frequently quoted maxim that "a man cannot serve two masters at the same time." Although an accepted rule of agency law, based on the principle that an agent owes undivided loyalty to the principal, see *J.C. Penney Co.* v. *Schulte Real Estate Co.,* 292 Mass. 42, 44 (1935), there is authority that, regarding a master-servant relationship, a single act may be done to effect the purposes of two independent employers. See Restatement (Second) of Agency § 226 (1958) ("A person may be the servant of two masters, not joint employers, at one time as to one act, if the service to one does not involve abandonment of the service to the other").

technician who was a hospital employee. Under an agreement between HMC and the hospital, HMC was to conduct, supervise, and manage the hospital's day-to-day operations and to supervise and manage all employees of the hospital. The agreement assigned HMC responsibility for all quality control aspects of the hospital's operation. Under the agreement, the administrator, controller, and director of nurses were to be employees of HMC, and all other employees were to be hospital employees. The agreement exonerated HMC from liability for the negligence of hospital employees, and, in addition, required the hospital to indemnify HMC for liability resulting from the hospital's employees and to name HMC as an additional insured on the hospital's general and professional liability policies. *Id.* at 171.[9]

Recognizing the North Carolina common-law rule that, "where a servant has two masters, a general and a special one, the latter, if having the power of immediate direction and control, is the one responsible for the servant's negligence," *id.* at 171, quoting *Jackson* v. *Joyner*, 236 N.C. 259, 261 (1952), the court reasoned that, although the technician was the nominal employee of the hospital, HMC was responsible for selecting and supervising the technician. Moreover, the court pointed out, HMC supervised the technician directly through the hospital administrator, who was an HMC employee. The court concluded that HMC was vicariously liable for any negligence found on the part of the technician. *Cahill* v. *HCA Mgt. Co., supra.*

We are not persuaded by this reasoning. The right to supervise, without more, has never been enough on which to base vicarious liability. See *Hopper* v. *Callahan*, 408 Mass. 621, 634 (1990); *Campbell* v. *Thornton*, 368 Mass. 528, 535-536 (1975). See also Restatement (Second) of Agency, *supra* at § 358(1) comment a, illustration 1 ("A is employed by P as general manager. B, a servant under the immediate direction of A, is negligent in the management of a machine, thereby injuring T, a business visitor. A is not liable to T"). It is not really

---

[9]The similarity between the provisions of the contract in evidence in *Cahill* v. *HCA Mgt. Co.*, 812 F.2d 170 (4th Cir. 1987), and the provisions of the contract between the city and Quorum, is understandable in light of the apparent fact that HCA Management Company, Inc., is the same company that executed the contract in this case with the city on January 3, 1989, and is Quorum's predecessor in interest.

disputed that, had Zane been employed by the city rather than by Quorum, her position as the hospital's director would not be sufficient to render her vicariously liable for the misconduct of any of the 1,200 city employees working at the hospital for which she was responsible. (To state an obvious truth, no master-servant relationship exists between fellow servants who work for the same master.) It is not Zane's supervisory authority over Farrag as the hospital's director, but Quorum's assumption, under the contract, of direction over Farrag's physical activities (i.e., setting her schedule; implementing in-service training; establishing rates of compensation and benefits), normally reserved to an employer, that raises the issue of possible vicarious liability on Quorum's part.

We come back then to the guiding principle used in deciding cases involving an assertion of vicarious liability — the right to control the physical conduct of the other in the performance of the service. See *Kelley* v. *Rossi*, 395 Mass. 659, 661 (1985). With this principle in mind, we focus on the particular conduct that led to the jury's finding of negligence — Farrag's failure to use that degree of care and skill in providing care to a person in the plaintiff's position that would have been used in 1991 by the average emergency room nurse practicing emergency room nursing. Vicarious liability for that failure, therefore, should be premised on the right to control the physical conduct of Farrag in the course of her treatment of patients in the emergency room, in short, her clinical care. It follows that the special question posed to the jury, whether Quorum had "the right or the power to control or direct the manner in which [Farrag] provided treatment to patients in the Emergency Room at [the hospital]," in these circumstances, was substantially correct.[10]

5. We now consider the evidence presented by the plaintiff on

---

[10]Nevertheless, the wording of the special question posed to the jury, specifically, the phrase, "the manner in which [Farrag] provided treatment to patients in the Emergency Room," is slightly ambiguous. In view of the judge's instruction that "Quorum is legally responsible for [Farrag's] negligence only if Quorum had the right or the power to control or direct [Farrag's] conduct as a nurse in the emergency room at [the hospital]," we interpret the question's scope to include the details of Farrag's interaction with patients in the emergency room, but not necessarily to include her actual clinical decisions. See *Konick* v. *Berke, Moore Co.*, 355 Mass. 463, 468

the subject of Quorum's control over Farrag. The question asked of the jury has to be considered in light of the provisions of the contract and, of course, the evidence most favorable to the plaintiff. The meaning of the contract's provisions, while not dispositive, are relevant. See Restatement (Third) of Agency § 1.02 and comment a (Tent. Draft No. 2 2001). There is no evidence (and the parties make no argument) that the contract's provisions were changed or modified in any respect by the parties' conduct, implicit agreement, or otherwise. The contract leaves little room to debate where the city and Quorum intended lines of responsibility to lie. The city hired Quorum to manage the hospital and provide it with a chief administrative officer and senior management team. The contract is explicit on the fact that Quorum is to be an "agent" of the city to implement its terms. In so acting, the city was to furnish *its* employees to the hospital, who were to be considered *solely* city employees, while personnel supplied by Quorum to work at the hospital were to be considered *solely* Quorum employees, and not city. Although the contract is not the definitive measure of the relationship between the city and Quorum, and of the determination of Quorum's liabilities with respect to Farrag's conduct, it is evidence of the intent of the parties.

The plaintiff is correct that Quorum, as manager of the hospital, had the right to exercise considerable direction and supervision over the nursing staff's activities. Quorum had responsibility for determining the nursing staff's wage scales and rates of compensation, as well as benefits and conditions of employment. While members of the nursing staff remained employees of the hospital and were paid by the city, it was Quorum that determined how much each nurse would be paid and Quorum paid the payroll. In short, Quorum had a substantial right to direct the general activities of the hospital's personnel, including the nursing staff, on a daily basis, although this power, under the contract, was subject to final approval by the city.

Uncontroverted testimony indicates, however, that neither Quorum, nor its management employees who assumed positions at the hospital, had the right to set hospital policy regarding the

(1969) (defining right to control "manner and means" as right to control "details" of servant's work).

treatment of patients. Quorum could implement quality control programs, with the approval of the board, and organize in-service training to ensure compliance with hospital policies and, under the contract, was responsible for ensuring that members of the hospital staff who made medical decisions were trained, knowledgeable, and familiar with the hospital's policies, with the overall goal of ensuring quality patient care.[11] The contract makes clear, however, that the hospital had no intention of giving up its control of medical matters. Zane's testimony confirms that, although she could correct lapses resulting from a nurse's unfamiliarity with the hospital's clinical policies, patient care issues were left to the medical staff and the members of the board, who acted for the city. The city installed Quorum and its employees as the chief administrative officer and management team of the hospital to deal exclusively with administrative and management matters, and the city retained control over, and thus liability for, clinical and medical matters (perhaps to ensure that the city would not lose the protections and limitations conferred on it by G. L. c. 258).[12]

6. We thus conclude that the evidence cannot support the jury's finding. We emphasize that no general rule can be stated in this type of case. The cases will be fact specific and liability may be influenced by the lawful arrangements parties to a writ-

[11]Although Quorum's responsibilities may have been directed to maintaining the professional standards of the hospital and ensuring quality patient care, the plaintiff does not charge that Quorum was directly negligent because of its failure properly to train or supervise the nursing staff, or its failure properly to implement hospital policy. The sole issue with which we are concerned is the extent of Quorum's actual right to control or direct the manner in which Farrag treated patients in the emergency room.

[12]This delineation of responsibility is typical of a hospital's organizational structure. See J.W. Smith, Hospital Liability §§ 1.02[1][d], 1.03[1] (1993) (describing usual dichotomy, whereby chief executive officer and administrative team manage hospital's daily operations and implement policies set by governing board, while governing board is responsible for establishing policy and maintaining quality patient care).

We point out here as well that the city obtained separate and private administration of the hospital when it became, according to the testimony, "the first public hospital in the United States to get FHA insured financing on bonds to build . . . a new hospital." The FHA required, as a condition of its commitment, that the city have private management.

ten contract for professional services have made between themselves.

*Judgment affirmed.*