Wilson, Paul D., J.
INTRODUCTION
This lawsuit arises out of the death of Kathleen Whittier after she left a patient room in the Emergency Department of Emerson Hospital where she had been waiting to be seen by a physician. Plaintiffs, Carmen Langthorne and Stephanie St. Laurence, as administrators of Whittier’s estate, initially filed suit against registered nurses Ann Marie Lopez, Michelle Kewley, and Kathy Marr in April of 2010, alleging negligence. After this court (Connolly, J.) allowed their motion to amend on July 11, 2011, Plaintiffs filed a Second Amended Complaint adding an allegation of vicarious liability against KEMM Care, Inc., a medical staffing company. The matter is now before me on KEMM Care’s motion for summary judgment, which the parties argued on December 13,2012. For the reasons set forth below, I will allow KEMM Care’s motion.
BACKGROUND
The facts, taken in the light most favorable to the nonmoving Plaintiffs, are as follows.
A. Medical Treatment of Whittier
Whittier came to the Emerson Emergency Department at about 12:10 p.m. on January 12, 2009. She reported not feeling well, feeling groggy and very vague, and body tingling “onset 2005.” Kewley was Whittier’s primaiy or attending nurse. At various times during Whittier’s stay, Kewley noted that she had “flat affect[,]” “poor eye contact!,]” and was sleeping in a “fetal position.” However, neither Kewley nor any other Emerson personnel recorded an Emergency Severity Index (“ESI”) rating, fall risk assessment, abuse screening, psychosocial analysis, or current neurological work-up in Whittier’s chart.
Kewley testified that she placed Whittier’s chart on a rack reserved for patients waiting to be seen by a doctor (the “to be seen” rack). At about 3:20 or 3:30 p.m., however, she saw Whittier’s chart on the rack reserved for patients who had already been seen by a doctor (the “room” rack) and remarked to Deborah T. Gobetz, M.D., “that’s not supposed to be there.”
Kewley was familiar with the rules, regulations, and nursing guidelines of the Emergency Department at Emerson, including those concerning the ESI, as well as the protocols involving triage. Once such protocol involved using “to be seen” and “room” racks to keep track of which patients had yet to be seen by a doctor; the charts are supposed to stay in the “to be seen” rack until they are picked up by a physician. Kewley did not know who would have moved Whittier’s chart from the “to be seen” rack, where she claims to have put it, to the “room” rack, where she later found it. At her deposition, Defendant Marr, the Charge Nurse for the Emerson Emergency Department at the relevant time on January 12, 2009, testified that the Charge Nurse had “some responsibility” for the “to be seen” rack, and that it was the Charge Nurse’s responsibility to make sure that patient charts were in the right order.
At some point after placing Whittier in a room in the Emergency Department, Kewley learned that Whittier had left without being seen by a doctor. Whittier’s husband arrived at the Emergency Department after her departure. He told Kewley that Whittier did not have a car and asked where she could be. Kewley suggested that Whittier might have gone to the cafeteria. Sometime later, Whittier’s husband came back to the Emergency Department, saying, “I don’t know where she is.” Kewley told him that the last time she had seen her was in her room, that she had discovered Whittier’s detached IV on the stretcher, and that she assumed Whittier left because she did not want to wait any more. At no time did Kewley report to her superiors or to Emerson security the risk that a patient with Whittier’s symptoms might be wandering outside the hospital without adequate shelter.
*2 Although she does not recall (nor does the entry itself state) when, Kewley made a “late entry” to the chart concerning Whittier’s 2005 neurological workup. She does not remember whether the arrival of the police, searching for Whittier later that day, prompted her to make the entry. Whittier was found deceased in a wooded area behind Emerson on the following day, January 13, 2009.
B. KEMM Care, Emerson, and the Contract Documents
KEMM Care is a medical staffing company that places, among other professionals, registered nurses in acute care hospitals and rehabilitation facilities. Throughout the company’s existence, clerical and administrative employees, none of whom have been licensed in any health care profession, have handled the administrative aspects of KEMM Care’s business.
Presently, as in January 2009, KEMM Care’s business model is to enter into staffing agreements with hospitals and rehabilitation facilities (i.e., KEMM Care’s clients), under which KEMM Care agrees to assign temporary workers to perform professional services at the client’s facility, subject to the client’s acceptance of the proposed candidates. In accord with staffing industry custom and practice, all temporary personnel, assigned by KEMM Care to work for its clients, remain on KEMM Care’s payroll and are eligible to receive employment benefits from KEMM Care during their assignments to KEMM Care’s clients. A typical KEMM Care placement ranges from thirteen to twenty-six weeks, with the possibility of extensions. In exchange for the services provided by the workers, KEMM Care receives fees from its clients, from which it pays the workers, overhead, and expenses.
Pursuant to their Staffing Agreement, both KEMM Care and Emerson made various obligations. KEMM Care agreed to supply workers’ compensation insurance and professional liability insurance (with limitations of not less than $ 1 million per claim for personnel submitted) for the temporary “personnel,” “candidates,” or “staff’ it placed at Emerson. KEMM Care also agreed to invoice Emerson for the services provided by these workers, and to remove a candidate at Emerson’s request in the event of documented, unsatisfactory performance after the first week.
Emerson agreed “not to solicit or attempt to hire on a regular, full time basis, any KEMM Care candidate until the completion of the initial contract, as specified in ‘Exhibit A,’ or a minimum of 520 hours worked!,]” and “to hire [a] candidate as a temporary only through KEMM Care, unless 6 months have passed from the time the candidate was presented to [Emerson] or had completed their assignment, which ever comes later.” The Staffing Agreement also required Emerson to designate a staff member to “act as coordinator and to orient KEMM Care candidates to all applicable safety procedures[ ]” and “provide an adequate orientation period for each candidate [as] part of the normal work period.”
In a series of addenda to the Staffing Agreement, KEMM Care and Emerson agreed to multiple placements of Kewley, of varying durations, between November of 2007 and March of 2009, to work “as an Emergency Department Nurse at the direction of the Nursing Supervisory” and that she would be “oriented by an appropriate preceptor.” By these addenda, KEMM Care and Emerson also agreed that “[Kewley] shall be employed by KEMM Care.”
By the Master Candidate Agreement between KEMM Care and Kewley, Kewley agreed that once KEMM Care presented her profile to a client, she would only accept an assignment with that client through KEMM Care, and that she would not accept permanent employment by that client without KEMM Care’s prior written permission. The Master Candidate Agreement also required Kewley to: comply with all KEMM Care and client policies and procedures; purchase malpractice insurance at her own cost; have time cards signed by a Supervisor after each shift worked and faxed back to the Agency by 12:00 noon EST each Monday; and obtain the approval of KEMM Care and the client before working any overtime.
A series of addenda to the Master Candidate Agreement, entitled “Assignment Agreements,” expressly refer to Kewley as an employee of KEMM Care. As such, Kewley was eligible to receive individual health and dental insurance through KEMM Care, although she waived this right as she had insurance coverage through her husband’s family policy. She was also eligible to participate in KEMM Care’s Direct Deposit, 40 IK, and Cafeteria 125 plans. KEMM Care withheld federal, state, Social Security, and Medicare taxes from each of Kewley’s paychecks and issued her W2s in 2007, 2008, and 2009.
Although it could have placed her at any of its other hospital customers, KEMM Care did not offer Kewley assignments to any facility other than Emerson. In Kewley’s understanding, she “pretty much [was] a permanent assignment to the Emerson E.R. through KEMM Care.” Upon her first assignment to Emerson, she received “a brief orientation with [its] Nurse Educator” and did “some testing” that Emerson required for newly-hired nurses.
Maureen Mancini, who in January 2009 was the Associate Nurse Manager of the Emergency Department at Emerson, oversaw the Emergency Department nurses, and was responsible for managing the clinical operations of the Emergency Department. After the incident concerning Whittier, Mancini offered Defendants Kewley, Marr, and Lopez the hospital’s “employee assistance program,” and let them know that Emerson would conduct a peer review investigation.
Kevin Whitney was, at all relevant times, the Vice President of Patient Care Services and the Chief Nurs *3 ing Director of Emerson. Whitney had supervisory control over the Emergency Department to the extent that the nurse director of the Emergency Department reported to him, and he testified that he was “responsible for the nurses.” At her deposition, Christine Schuster, Emerson’s President and CEO, confirmed that all the nurses in the organization reported to Whitney, and there is no evidence in the record to the contrary.
DISCUSSION
Under the familiar standard, summaiy judgment is appropriate when there are no genuine issues of material fact and, viewing the evidence in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law. Gray v. Giroux, 49 Mass.App.Ct. 436, 438 (2000); see Mass.R.Civ.P. 56(c).
The issue raised by KEMM Care’s summaiy judgment motion is legal in nature. Plaintiffs allege that Kewley was negligent in her care and treatment of Whittier, and that KEMM Care, as Kewley’s employer, is vicariously liable for her negligence. KEMM Care concedes that it was Kewley’s employer, but says that because Emerson Hospital alone controlled how she practiced nursing, it is not liable for Kewley’s negligence as a matter of law.
1. Control of Kewley’s Patient Care Actions
Under traditional agency law, “[a]n’ employer is liable for torts committed by employees while acting in the scope of their employment.” Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317, 322 (2002) (alteration in original) (citation omitted). Therefore, where the existence of an employer-employee relationship is not contested, the employer is deemed to have the requisite right to direct and control the employee’s performance; to establish vicarious liability, the plaintiff need only show that the tort occurred within the scope of employment. Id. at 321-23 & n.8.
KEMM Care suggests, however, that Kewley was a “borrowed servant,” i.e., on loan to the hospital and subject to that parly’s direction and control, at the time of the allegedly tortious conduct, and thus KEMM Care, the “lending” employer, is relieved of liability. KEMM Care cites to Hohenleitner v. Quorum Health Res., Inc., 435 Mass. 424 (2001), which, it argues, requires judgment in its favor.
In Hohenleitner, the Supreme Judicial Court said that the borrowed servant analysis merely “restates the general rule of control necessary to establish a master-servant relationship.” Id. at 434 (further explaining, “Our test for determining borrowed servant status is ‘whether, in the particular service which [the person] is engaged to perform, he continues liable to the direction and control of his master or becomes subject to that of the party to whom he is lent or hired.’ ” [alteration in original] [citation omitted]). Where the allegation is negligence in providing professional medical services, i.e., patient care and treatment, the Supreme Judicial Court has interpreted “direction and control” to mean the right to control the physical conduct of medical providers in the course of their treatment of patients; in short, their clinical care. Id. at 436.
There is no dispute that KEMM Care was Kewley’s general employer and that it contracted with Emerson Hospital for Kewley to work in the hospital’s emergency room. The record further indicates that KEMM Care had the right to, and did, exert some administrative control over Kewley—e.g., KEMM Care paid her wages, offered her benefits, supplied her with workers’ compensation and professional liability insurance, and required her to abide by its rules, in addition to Emerson’s. The dispositive issue for purposes of this motion, however, is whether, in the course of her treatment of Whittier, Kewley was subject to KEMM Care’s direction and control.[4]1 find that she was not.
First, none of the employees who handle the administrative aspects of KEMM Care’s business have ever been licensed in any health care profession. Thus, KEMM Care’s direction and control over the details of Kewley’s patient care was not, as a practical matter, feasible.
Further, in accordance with the Staffing Agreement between KEMM Care and Emerson, and its addenda, Kewley was placed at the hospital to work “as an Emergency Department Nurse at the direction of the Nursing Supervisor.” In regards to her patient care, Kewley was subject to a supervisory hierarchy at Emerson, including: the Charge Nurse, who was responsible for making sure that patient charts were in the right order; the Associate Nurse Manager, who oversaw the nurses, managed the clinical operations of the Emergency Department, and, after the incident involving Whittier, informed Kewley that the hospital would be conducting a peer review investigation; and the Vice President of Patient Care Services and Chief Nursing Director, to whom all of the nurses in the organization reported.
Finally, while KEMM Care’s agreement with Kewley required her to comply with all KEMM Care and client policies and procedures, the record contains no evidence that KEMM Care had established any policies or procedures specifically related to the care and treatment of patients. In contrast, Emerson’s policies and procedures included nursing guidelines concerning the ESI, as well as protocols (such as how to manage patients using the “to be seen” and “room” racks) involving triage.
“[T]he guiding principle used in deciding cases involving assertion of vicarious liability [is] the right to control the physical conduct of the other in the performance of the service.” Hohenleitner, 435 Mass. at 436. Here, the undisputed facts demonstrate that, in the course of her treatment of Whittier, Kewley was not *4 subject to KEMM Care’s direction and control. As a result, KEMM Care is entitled to summary judgment.
Plaintiffs’ two legal arguments to the contrary do not justify a different result.
2. The Effect of the Dias Decision
First, Plaintiffs suggest that Dias v. Brigham Med. Assocs., Inc., 438 Mass. 317 (2002), eliminated application of the direction and control analysis as to any employer of a medical professional, and therefore requires imposition of vicarious liability on KEMM Care for the actions of Kewley simply because KEMM Care employed Kewley. In Dias, the Supreme Judicial Court set out a two-part test for determining whether “a physician practice group” was vicariously liable for the malpractice of a physician who was a “member” of that physician practice group. 438 Mass. at 317. In that context, the court said, a plaintiff alleging negligent treatment by the physician is entitled to relief against the physician practice group so long as the physician was an employee of the physician practice group, and the alleged negligent treatment occurred within the scope of that employment. Dias, 438 Mass. at 321-22.
Dias, however, does not take them as far as Plaintiffs might hope. The Dias court was focusing on a slightly different question than the one presented by this case: vicarious liability of employers that are in the business of providing health care services to patients. Viewed through that lens, Dias is simply the culmination of a line of cases concerning whether any employer could ever be vicariously liable for a physician’s patient treatment decisions, given that those decisions require such a high level of skill, training, and independent judgment.
That line of cases stretches back to Konick v. Berke, Moore Co., 355 Mass. 463 (1969). In Konick, the Supreme Judicial Court brought Massachusetts into the modem era of respondeat superior law, overthrowing the historical mle, expressed in this jurisdiction in Khoury v. Edison Elec. Illuminating Co., 265 Mass. 236 (1928), that an employer was only vicariously liable for the acts of its employee if the employee was “subject to control by the employer, not only as to the result to be accomplished but also as to the means to be used.” Id. at 238. Applying that mle in Khoury, the court found no employer liability in an auto accident case, because the employer had not prescribed the route to be followed by its employee driver. In Konick, also an auto accident case, the court adopted a new mle for vicarious employer liability: “if there is a right to control the employee’s general activities, he is a servant, even though the master may not have the right to control the details of the operation of the car when the servant is carrying out an errand for his master.” Konick, 355 Mass. at 467.
But driving a car for an employer is one thing, and practicing medicine is another. Defendants in the health care field resisted the application of the Konick mle to the practice of medicine, arguing that, because of “the very nature of the physician’s function . . . [ajnother person, unless a physician himself, would have no right (or desire) to exercise control over the details of the physician’s treatment of the patient; the profession is distinct and requires a high level of skill and training; and the physician must use independent judgment.” Kelley v. Rossi, 395 Mass. 659, 662 (1985). Acknowledging these realities of the medical profession, the Kelley court nonetheless applied the Konick rule to the practice of medicine, holding that a hospital could indeed be liable for the actions of a medical resident who practiced medicine at that hospital. The Supreme Judicial Court then remanded the case to the Superior Court for fact-finding. Significantly, the error that required remand, the Kelley court said, was that the Superior Court had “failed properly to assess the summary judgment material to determine what evidence tended to show that the doctor was subject to the direction and control of the hospital.” Id. at 663.
Dias, the case on which Plaintiffs so heavily rely, simply applies Kelley to a different fype of master-servant relationship in the health care field. The defendant seeking dismissal there was not a hospital, but rather “a so-called ‘medical practice group’ . . . comprised entirely of physicians specializing in obstetrical medicine.” 438 Mass. at 316. The allegedly negligent physician, it was undisputed, was an employee and officer of that “so-called ‘medical practice group.’ ” Id. at 316-17. The Superior Court had granted summary judgment for the medical practice group because it read Kelley as saying that, while a hospital can be vicariously liable for any negligence committed by a doctor at that hospital, a physician is otherwise presumed to be an “independent contractor” and thus no other master is liable for his negligence. Id. at 321. That was error, Dias said; a physician’s employer, too, can be liable for his negligence. In light of the specific facts of Dias, the court said, it was unnecessary for the court to perform the Kelley-required analysis of whether the health care entity “reserved the right to direct and control a physician’s treatment decisions,” because it was undisputed that the medical practice group was the physician’s employer, Dias, 438 Mass, at 321, and so therefore it was vicariously liable for his treatment decisions.
But the employer in Dias was a medical practice group, comprised entirely of physicians. It was the very business of that medical practice group to practice medicine, and to make treatment decisions through the individual acts of its employee physicians such as the defendant doctor. Today’s case is different, in that KEMM Care, the employer whom Plaintiffs seek to hold vicariously liable, does not practice medicine. Furthermore, its contract with Emerson Hospital concerning Kewley’s services specifically states that Kewley would be working at the direction of the Hospital’s Nursing Supervisor. That contract provision undoubtedly springs from the fact that no one at *5 KEMM Care is licensed to practice medicine or any other health care profession, and therefore KEMM Care could not direct or control Kewley’s actions as a nurse, either practically or legally.
Because KEMM Care, an undisputed employer of Kewley, does not practice medicine, this case is more akin to Hohenleitner v. Quorum Health Resources, Inc., 435 Mass. 424 (2001). In Hohenleitner, as here, the medical professional who allegedly committed malpractice was an emergency room nurse. Also as in this case, the hospital where she worked benefited from a statutory cap on liability (there because the hospital was owned by a municipality, and here because the hospital is a non-profit organization). A third parallel is that in both cases the plaintiffs, undoubtedly because of the limited liability of the hospital, asserted a vicarious liability theory against another entity that could well be seen as a second “master” of the emergency room nurse. In Hohenleitner, that second master was Quorum Health Resources, Inc., a management company that operated the hospital under a written contract, pursuant to which it provided the hospital with a director and other senior management.
As the company managing the hospital, Quorum had substantially more control over the emergency room nurses than did KEMM Care in today’s case. Quorum “supervised the hospital operations on a day-to-day basis”; set staffing schedules; managed the supervisors, including the administrator of nursing; established in-service training programs and required attendance at seminars and conferences by nurses; and implemented quality control programs. Hohenleitner, 435 Mass. at 424. The court summarized Quorum’s responsibilities as follows: “Quorum, in essence, was responsible for making sure that nurses and other persons making medical decisions were familiar with hospital policy and had the resources available, and were sufficiently trained and qualified, to make proper medical decisions.” Id.
That responsibility is far beyond any power to direct and control possessed by KEMM Care. Nonetheless, the Hohenleitner court found that it was insufficient to hold Quorum vicariously liable for the actions of the emergency room nurse. “We come back then to the guiding principle used in deciding cases involving assertion of vicarious liability—the right to control the physical conduct of the other in the performance of the service.” Id. at 436, citing Kelley, 395 Mass. at 661. Vicarious liability for negligence by the emergency room nurse, the court held, “should be premised on the right to control the physical conduct of [the nurse] in the course of her treatment of patients in the emergency room, in short, her clinical care.” Id.
To determine whether Quorum had that right of control, the Hohenleitner court first turned to the contract between Quorum and the hospital, id. at 437, which made clear that “patient care issues were left to the hospital, not Quorum. Id. at 438. Emphasizing that ”no general rule can be stated in this type of case," the court ruled that Quorum could not be held vicariously liable for the actions of the emergency room nurse. Id.
The theme that emerges from all these cases is that vicarious liability is imposed on a master who has the right to direct and control the clinical decisions of the defendant health care professional. Hohenleitner calls that the “guiding principle” of vicarious liability cases. Kelley directed the Superior Court to find facts about whether the doctor was subject to the direction and control of the hospital. And even Dias pointed out that the usual test for vicarious liability considers direction and control. 438 Mass. at 322.
Ignoring the warning of Hohenleitner that there are no general rules in cases of this type, Plaintiffs argue for just such a general rule: anyone who employs a nurse, as KEMM Care does here, is liable for all clinical decisions made by the nurse in the course of her duties. If Dias meant to establish such a general rule, that rule must necessarily contain at least one exception: employers who have no ability to direct or control clinical decisions cannot fall within the scope of the Dias rule. Imposing liability on employers who could not influence clinical decisions if they wanted to, as in Hohenleitner and in this case, would ignore the guiding principle of the law of vicarious liability.
At least one other Superior Court judge has decided a post-Dias borrowed servant case by analyzing which of the masters had the right to exercise control over the details of a nurse’s clinical care. In determining whether a hospital could be held vicariously liable for a nurse anesthetist’s alleged malpractice, Judge Kern first analyzed the contract between the hospital and a medical practice group that provided nurse anesthetists to the hospital as “independent contractors, not as employees or agents.” Monahan v. Sorour, 26 Mass. L. Rptr. 455, 2009 WL 5909271 at *1 (Mass.Super.Ct. Nov. 17, 2009). That contract provided that the hospital “shall neither have nor exercise any specific control or direction over the particular methods by which [the medical practice group] shall perform the services required by this agreement.” Id. Judge Kern found no other evidence in the summary judgment record to suggest that the hospital “had the right to exercise direct control” over the clinical care provided by the nurse anesthetist. Id. at *2. While the nurse anesthetist had to follow “rules, regulations and bylaws created by the hospital,” id. at *2—just as Kewley had to follow the rules and policies of KEMM Care here—that was not enough to subject the hospital to vicarious liability, because “that obligation falls short of giving [the hospital] the right to directly control the details of the patient care given by” the nurse anesthetist. Id. Citing Hohenleitner and Kelley, the court ruled that vicarious liability followed the right to control *6 patient care decisions, a right held by the medical practice group but not the hospital. Id.
Here, because it could not control the nurse’s patient care decisions, KEMM Care cannot be vicariously liable for those decisions, Dias notwithstanding.
3. Enterprise Liability
Plaintiffs’ second argument, expressed as well by Defendant Kewley in her own opposition to KEMM Care’s motion for summary judgment, requires less attention. Plaintiffs and Kewley suggest that, rather than adopting a “control focused analysis,” Kewley’s Opposition to Motion for Summary Judgment at 6, I should instead apply the concept of “enterprise liability.” Id. Under that theory, responsibility for a loss is placed on a business “enterprise” whose employee caused the loss rather than on the injured person, on the theory that society should allocate risks to those who are better able to bear them. Plaintiffs and Kewley point out that the appellate courts of other states have used an enterprise liability theory to hold medical staffing agencies liable in medical malpractice cases (just as KEMM Care cites decisions of appellate courts from other states declining to apply enterprise liability theory to staffing agencies).
There is precedent in Massachusetts for the use of an enterprise liability theory. In fact, Konick, the 1969 decision in which the Supreme Judicial Court adopted the rule that employers would henceforth be vicariously liable for their employees’ general activities even where the employer did not exercise control over the details of the employee’s acts, could be seen as an enterprise liability decision. But that decision was rendered by the Supreme Judicial Court, not the Superior Court. Until the Supreme Judicial Court, or the state legislature, applies the enterprise liability theory to hold liable medical employers who have no right to control the patient care rendered by their employees, I am bound by existing precedent to use the control test in determining the liability of KEMM Care. Under that test, KEMM Care cannot be liable.
ORDER
For the foregoing reasons, KEMM Care’s Motion for Summary Judgment is ALLOWED.

he question whether Kewley was subject to the direction and control of Emerson Hospital is not before me, as Emerson is not a party to this action.